# FOR PUBLICATION

**FOR PUBLICATION**

FILED & ENTERED

MAR 08 2019

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY Pgarcia    DEPUTY CLERK

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>MORRIS SHAPOW,<br><br>Debtor.<br>───────────────────<br>WEST VALLEY MEDICAL PARTNERS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>MORRIS SHAPOW aka MIKE SHAPOW,<br><br>Defendant. | Case No. 1:15-bk-13962-MB<br><br>Chapter 7<br><br>Adv. No. 1:16-ap-01021-MB<br><br>**MEMORANDUM OF DECISION FOLLOWING TRIAL** |

On March 2, 5, and 9, 2018, the Court conducted a trial in this adversary proceeding. Jamie R. Schloss represented plaintiff West Valley Medical Partners, LLC ("West Valley" or the "Plaintiff"). Michael Jay Berger represented defendant Morris Shapow aka Mike Shapow ("Shapow" or the "Defendant"), the chapter 7 debtor herein. This memorandum constitutes the Court's findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, made applicable here by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

1  Plaintiff objects to Defendant's discharge pursuant to Bankruptcy Code sections

2  727(a)(2)(A), (a)(3), and (a)(4)(A).[1]  For the reasons set forth herein, the Court finds that Plaintiff

3  has not met its burden on any of its causes of action.  Accordingly, the Court will enter judgment in

4  favor of Defendant on the entire complaint.

5  ## I.    JURISDICTION

6  The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334(b).

7  Venue is proper pursuant to 28 U.S.C. § 1409(a).  This adversary proceeding is a core proceeding

8  pursuant to 28 U.S.C. § 157(b)(2)(J), and this Court has the constitutional authority to enter a final

9  judgment on the Complaint.  *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015)**;** *Stern v.*

10  *Marshall*, 131 S. Ct. 2594 (2011).

11  ## II.    PROCEDURAL HISTORY

12  On November 30, 2015, Defendant filed his voluntary petition under chapter 7 of the

13  Bankruptcy Code (the "Petition Date").[2]  David K. Gottlieb was appointed the chapter 7 trustee (the

14  "Trustee").  On August 11, 2016, the Trustee moved to dismiss the bankruptcy case based on

15  Defendant's alleged failure to provide the following: (1) a copy of a complaint filed against

16  Defendant by a former employee (and failure to amend his schedules to include the former

17  employee as a creditor); (2) an explanation for a sale or transfer of a property located on Abington

18  Drive in Beverly Hills; (3) an explanation of who owns the entities Java, LLC and Mc3rd Trust;

19  (4) an explanation for whether or not Defendant was a beneficiary of any estate or trust; (5) a copy

20  of the closing statement from the sale of the Abington Drive property; (6) a list of all lienholders

21  that were paid from the sale of the Abington Drive property with an explanation of Defendant's

22  relationship to the lienholder; and (7) copies of all trust documents for all trusts indicating the

23  identity of all trustees and beneficiaries.  Case Dkt. 35.  On August 31, 2016, Defendant filed a

24  declaration responding to the issues raised in the Trustee's motion to dismiss.  Case Dkt. 41.  The

25

26

27

28

---

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532.
[2] The Court takes judicial notice of its files and records under Rule 201 of the Federal Rules of Evidence.  *See In re Clark*, 525 B.R. 442, 449 (Bankr. D. Idaho 2015), *aff'd*, 2016 WL 1377807 (B.A.P. 9th Cir. March 29, 2016) (taking judicial notice of papers filed on its docket and noting, "Papers filed in a bankruptcy case by a debtor under penalty of perjury also have evidentiary significance under Fed. R. Evid. 801(d)").

1  Trustee withdrew his motion to dismiss on the following day.  Case Dkts. 42, 44.  On September

2  16, 2016, the Trustee filed his "no-asset" report.

3      On February 24, 2016, Plaintiff commenced this adversary proceeding by filing a complaint

4  against Defendant timely asserting claims under Bankruptcy Code sections 727(a)(2), (a)(3), and

5  (a)(5).  Adv. Dkt. 1.  On March 25, 2016, Defendant moved to dismiss the complaint pursuant to

6  Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief

7  can be granted.  Adv. Dkt. 3.  On May 6, 2016, the Court granted Defendant's motion to dismiss

8  with leave to amend as to all three causes of action.  *See* Adv. Dkt. 14.

9      On June 3, 2016, Plaintiff filed its First Amended Complaint ("FAC"), the operative

10  complaint herein, asserting claims under Bankruptcy Code sections 727(a)(2)(A),[3] (a)(3), and

11  (a)(4)(A).  Adv. Dkts. 18 (unsigned), 39 (signed).  On July 6, 2016, Defendant moved to dismiss

12  the FAC pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a

13  claim upon which relief can be granted.  Adv. Dkt. 22.  On August 15, 2016, the Court denied

14  Defendant's motion to dismiss.  *See* Adv. Dkts. 37, 38.  On August 25, 2016, Defendant answered

15  the FAC.  Adv. Dkt. 43.  The parties thereafter had a contentious relationship, and Defendant

16  moved to dismiss the proceeding for failure to prosecute, *see* Adv. Dkt. 52, which motion was

17  denied, Adv. Dkt. 68.  The parties could not agree on a pre-trial stipulation until the Court

18  intervened at a pre-trial conference on December 14, 2017.  *See* Adv. Dkts. 88, 89.  The Court

19  imposed a monetary sanction on Plaintiff's counsel for his role in the parties' failure to file a pre-

20  trial stipulation by the ordered deadline.  *See* Adv. Dkt. 90.

21      On December 18, 2017, the parties filed a joint pre-trial stipulation (the "Pre-Trial

22  Stipulation" or "PTS") limiting Plaintiff's claims for relief to three causes of action under

23  Bankruptcy Code sections 727(a)(2)(A), (a)(3), and (a)(4)(A).  Adv. Dkt. 88.  The Court thereafter

24

25  [3] While the FAC did not specify a subsection of section 727(a)(2) on which the claim was based, it does allege that it
pertains to "property of the Defendant [Debtor] within one year prior to the date of the filing of the petition . . ."  *See*
FAC, ¶ 30.  This language is nearly identical to section 727(a)(2)(A), and the Court has previously ruled that this claim

26  is one under section 727(a)(2)(A).  *See Memorandum Re: Order Denying Motion to Dismiss*, Adv. Dkt. 37 at 6
("Defendant is correct that the FAC does not expressly state whether it is seeking relief under section 727(a)(2)(A)

27  (which pertains to prepetition acts) or section 727(a)(2)(B) (which pertains to postpetition acts).  But the FAC
specifically alleges acts undertaken before the petition date.  This is adequate to put Defendant on notice that the

28  Plaintiff is asserting a claim under section 727(a)(2)(A).").

*(Continued...)*

**MEMORANDUM OF DECISION**

1  entered an order approving the Pre-Trial Stipulation (the "Pre-Trial Order" or "PTO").  Adv. Dkt.

2  89.  Both the Pre-Trial Stipulation and the Pre-Trial Order provide that they supersede the

3  pleadings and govern the course of trial in this proceeding.  *See* PTS at 38; PTO, ¶ 1.[4]

4         At trial, Plaintiff called as witnesses (1) its principal, Gary Grabel, (2) its counsel, Jamie R.

5  Schloss, and (3) Defendant.  Plaintiff also offered the deposition transcript of Lori Milas of

6  Westshore Medical Billing, Inc., Plaintiff's Exhibit 91, and both parties designated portions thereof.

7  After Plaintiff concluded its case in chief, Defendant moved for the equivalent of a nonsuit.[5]  Both

8  parties argued, and the Court denied the motion.  Defendant then called himself and Roy Silver as

9  witnesses.  The Court had the opportunity to observe each of the witnesses, evaluate their

10 demeanor, consider their testimony, and assess their credibility.

11        After providing the parties with an opportunity to respond, the Court memorialized its

12 evidentiary rulings on the exhibits offered into evidence by both parties.  Adv. Dkts. 113, 127.  The

13 Court admitted the following exhibits offered into evidence by Plaintiff: 9, 15, 20, 26, 27, 36, 40,

14 44, 46, 48, 60, 61, 62, 63, 64, 65, 66, 67, 69-C, 70, 73, 74, 75, 78, 79, 80, 82, 83, 84, 88, 91, 96,

15 106, 107, and 108.  The Court denied admission of the following exhibits offered by Plaintiff: 22,

16 24, 34, 69, 76, 77, 81, and 97.  Plaintiff withdrew its motion to admit Exhibit 110 into evidence.

17 The Court admitted the following exhibits offered into evidence by Defendant: A, F, G, H, I, J, K,

18 N, O, P, and Q.  All other exhibits lodged with the Court were never offered into evidence at trial.

19        With leave of Court, the parties submitted their closing arguments in writing in the form of

20 post-trial briefs.  *See* Adv. Dkts. 120, 121, 124.[6]  Upon Court order, Adv. Dkts. 127, 133, the

---

22 [4] In its post-trial brief, Plaintiff introduced a new cause of action under Bankruptcy Code section 727(a)(5) and seems
to have abandoned the cause of action under Bankruptcy Code section 727(a)(3).  *See* Adv. Dkt. 120.  First, the section

23 727(a)(5) claim is barred because it was not included in the Pre-Trial Stipulation and Order, it first appeared in the
post-trial brief, the Defendant did not have an opportunity to defend against such a claim, and the Plaintiff presented no
evidence at trial to support such a claim.  *See U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 348 F. App'x 208, 211

24 (9th Cir. 2009) (citing *Eagle v. Am. Tel. and Tel. Co.*, 769 F.2d 541, 548 (9th Cir.1985) (a new theory of relief will be
barred if not included in the final pretrial order)).

25 Second, even though Plaintiff seems to have abandoned its cause of action under Bankruptcy Code section 727(a)(3),
the Court discusses below why Plaintiff failed to prove such a claim at trial.  *See infra* Section IV.D.

26 [5] Defendant's counsel brought the motion pursuant to Rule 41(b) of the Federal Rules of Civil Procedure, but the
authority for such a motion has been Rule 52(c) since the Rules were amended in 1991.  *See Maciel v. Rowland*, 5 F.3d
537, 1993 WL 339829, at *2 n. 3 (9th Cir. 1993) (table decision).  Dismissal under Rule 52(c) is "the same as a

27 judgment after a bench trial."  *Id.* at *2.

28 [6] Local Bankruptcy Rule 9013-2(b) provides in relevant part that a trial brief must not exceed 35 pages in length
"unless otherwise ordered by the court on motion filed and served pursuant to LBR 9013-1(p)," and any brief   *(Continued...)*

1  parties electronically filed on the docket all exhibits that were offered into evidence at trial.  *See*

2  Adv. Dkts. 129, 130, 134.  The causes of action asserted in this adversary proceeding are now ripe

3  for decision.

### III.   FACTS

#### A.   The Parties

6      Defendant has been a licensed physical therapist for approximately 40 years.  Trial

7  Transcript dated March 2, 2018, Adv. Dkt. 115 ("Trial Tr., March 2") at 81:18-82:6.  He has

8  operated physical therapy clinics whose patients included those with personal injury and workers'

9  compensation claims.  *Id.* at 83:22-84:12; PTS at 3, ¶ 6.  Defendant owns, controls, or has an

10  interest in several corporate entities.  PTS at 3, ¶ 7.

11      Plaintiff is a commercial lessor that used to lease office space to a corporation controlled by

12  Defendant.  Trial Tr., March 2 at 12:4-20.  Plaintiff obtained a $474,000 stipulated judgment on

13  September 17, 2010, against Defendant and his wholly owned corporation, Total Wellness

14  Rehabilitation, Inc., on a breach of contract action in Los Angeles Superior Court, LASC Case No.

15  LC084044 (the "State Court Judgment").  Plaintiff's Ex. 48; PTS at 3, ¶ 8; Trial Tr., March 2 at

16  14:2-14.  In the years that followed, Plaintiff attempted to collect on its State Court Judgment by

17  conducting multiple judgment debtor examinations of Defendant, moving to compel production of

18  documents, and moving for an assignment and restraining order.  PTS at 8, ¶¶ 3-5; Trial Transcript

19  dated March 5, 2018, Adv. Dkt. 116 ("Trial Tr., March 5") at 87:16-109:13; Plaintiff's Exs. 66, 67,

20  69-C, 70, 73, 74, 75, 78, 79, 80, 82.  Plaintiff contends that throughout the State Court Judgment

21  debtor proceedings Defendant possessed but failed to produce documents that were responsive to

22  Plaintiff's document demands.  Trial Tr., March 5 at 87:16-109:13.  Plaintiff's principal, Gary

23  Grabel, testified that Defendant "never paid a penny" on the State Court Judgment.  Trial Tr.,

24  March 2 at 14:15-18.

25

26  exceeding 10 pages in length must by accompanied by a table of authorities.  LBR 9013-2(b)(1), (3).  Failure to comply with the Local Bankruptcy Rules may be grounds for the imposition of sanctions.  LBR 1001-1(f).  Notwithstanding LBR 9013-2(b), Plaintiff submitted a post-trial brief 45 pages in length without bringing a motion under LBR 9013-

27  1(p)(11), and the brief did not include a table of authorities.  *See* Adv. Dkt. 120.  However, the Court will exercise its discretion and grant Plaintiff *nunc pro tunc* relief from LBR 9013-2(b) because (i) Defendant had an opportunity to respond to the issues raised in Plaintiff's brief, *see* Adv. Dkt. 121, and (ii) Defendant will not otherwise be prejudiced

28  by such relief.

1    Defendant previously filed a chapter 13 bankruptcy petition on December 12, 2012

2  ("Defendant's First Bankruptcy Case").  *See* Case No. 2:12-bk-50729-NB.  Defendant's First

3  Bankruptcy Case was converted to chapter 11 then dismissed on October 3, 2013.  *See id.*; PTS at

4  2, ¶ 1.  Defendant filed the instant chapter 7 petition on November 30, 2015.  PTS at 2, ¶ 2.

5  Eighteen days earlier, Defendant filed a chapter 7 petition on behalf of his wholly owned and

6  controlled corporation, the same entity against which Plaintiff obtained the judgment, Total

7  Wellness Rehabilitation, Inc. (the "Total Wellness Rehabilitation Case").  *See* Case No. 1:15-bk-

8  13752-VK; PTS at 2, ¶ 3; Trial Tr., March 2 at 55:23-56:4.[7]  In both this case and the Total

9  Wellness Rehabilitation Case, Defendant prepared the petition, schedules, and statement of

10  financial affairs and signed those documents under penalty of perjury.  Trial Tr., March 2 at 55:11-

11  56:24; Plaintiff's Exs. 60-65.

12    **B.    Income and Accounts Receivable**

13    On Defendant's Statement of Financial Affairs ("SOFA") in this case, in response to item 1

14  regarding income from employment or operation of a business, he estimated gross income of

15  $9,014 in 2013, $110,000 in 2014, and $49,000 in 2015.  Trial Tr., March 2 at 65:8-25; Plaintiff's

16  Exs. 61, 62 at 27; Defendant's Ex. N at 6.  Defendant testified that he had no personal bank

17  accounts as of the Petition Date.  Trial Tr., March 2 at 67:16-20.  He pays for his personal expenses

18  by withdrawing money from one of his company's accounts.  Trial Tr., March 5 at 56:16-57:14.

19  On the Schedule B in this case, Defendant claimed to have no interest in accounts receivable.

20  Plaintiff's Ex. 61 at 8; Defendant's Ex. N at 3; PTS at 3, ¶ 9; *see* Trial Tr., March 2 at 80:11-15.

21    In the Total Wellness Rehabilitation Case, in response to item 1 of the SOFA regarding

22  income from employment or operation of a business, the debtor therein estimated income from

23  accounts receivable of $5,000, $5,000, and $3,000 for 2013, 2014, and 2015, respectively.

24  Plaintiff's Ex. 65 at 19; PTS at 4, ¶ 10.  On the Schedule B in the Total Wellness Rehabilitation

25

26  _____

27  [7] Total Wellness Rehabilitation, Inc. previously filed a chapter 7 petition on October 30, 2014, and that case was dismissed on January 6, 2015, based on the debtor's failure to attend the section 341(a) meeting of creditors.  *See* Case No. 1:14-bk-14913-MT at Case Dkt. 7.  Although Plaintiff's counsel questioned Defendant about that bankruptcy case,

28  *see, e.g.,* Trial Tr., March 2 at 182:19-183:12, Plaintiff has not presented evidence from that previous case or made a coherent argument about what relevance, if any, it might have to the present matter.

**MEMORANDUM OF DECISION**

1   Case, the debtor therein claimed an interest in $463,936.52 in accounts receivable, which it

2   estimated to have a face value of 10-20%, or $69,590.00.  Plaintiff's Ex. 63 at 6; PTS at 4, ¶ 10.

3         Defendant testified that he does not personally bill for his physical therapy services.  Trial

4   Tr., March 2 at 83:18-19, March 5 at 27:17-28:8.  Since as early as 2011 to the present, Defendant

5   has billed for his services through a company.  Trial Transcript dated March 9, 2018, Adv. Dkt. 119

6   ("Trial Tr., March 9") at 10:19-11:2.  He testified that he listed no accounts receivable on his

7   bankruptcy schedules because he did not personally own any accounts receivable on the Petition

8   Date.  Trial Tr., March 5 at 34:16-35:13.  He said that he always bills through one of his

9   companies, and the respective company is the owner of the accounts receivable.  Trial Tr., March 5

10  at 27:17-28:8.  Defendant's companies typically collect on about only 25 to 30 percent of their

11  accounts receivable due to insurance companies' discretionary price reductions and the difficulty of

12  collecting on personal injury and workers' compensation claims.  Trial Tr., March 5 at 64:4-65:18.

13  Defendant testified that for a health care provider to bill an insurance company it must be assigned

14  a national provider identifier number ("NPI").  Trial Tr., March 9 at 11:13-12:8.  He testified that

15  although the companies through which he bills have their own NPI, he does not personally have an

16  NPI.[8]  Trial Tr., March 9 at 12:9-14:10.  From 2013 through 2015, all his clients paid by insurance.

17  Trial Tr., March 9 at 13:3-8.  Defendant testified that "Total Wellness" and "Joint Effort" held

18  accounts receivable for work performed by Defendant in the one-year period before the Petition

19  Date.  Trial Tr., March 2 at 87:4-88:11.  He later testified that he "billed through" "Beverly Hills

20  Health Works" in the six months before the Petition Date, and that this was the same entity as

21  "Beverly Hills Health Works II dba Joint Effort Medical Wellness" listed in the bank statements

22  offered into evidence by Plaintiff.  Trial Tr., March 9 at 49:20-50:1; *see* Plaintiff's Exs. 84, 108.

23        Defendant controlled multiple bank accounts at JPMorgan Chase belonging to certain of his

24  related entities.  *See* Plaintiff's Exs. 84, 106-108.  Plaintiff presented bank statements for two such

25

26  _____

    [8] This testimony might be contrary to information provided by Defendant to Westshore Medical Billing, Inc. in two
    forms that enabled Westshore to access his billing software.  Ex.107 to Depo. Tr., Plaintiff's Ex. 91; *see* Depo Tr. at
27  50:21-51:3.  Those forms list unique NPIs for "Joint Effort Medical Wellness" and "BKP Wellness," 1083885834 and
    1740462837, respectively; however, in the field labeled "Individual/Rendering Provider NPI," both forms list the same
    NPI: 1477609733.  *See* Ex. 107 to Depo. Tr. at 2, 3.  Because Plaintiff did not question Defendant or present evidence
28  about the NPIs listed on those forms, the Court cannot conclude that Defendant had his own NPI.

**MEMORANDUM OF DECISION**

accounts from certain months in 2014 and 2015. *See id.* One account, ending in 2619, was in the name of Beverly Hills Health Works II dba Joint Effort Medical Wellness (the "BHHW Bank Account"). Plaintiff's Exs. 84, 108; Trial Tr., March 2 at 105:2-25, 169:19-170:17. Another bank account, ending in 1150, was originally in the name of Joint Effort Medical Wellness and changed in early 2014 to the name of Joint Effort Medical Wellness II (the "Joint Effort Bank Account"). Plaintiff's Exs. 106, 107; Trial Tr., March 2 at 167:11-168:10.

The bank statements admitted into evidence reflect the following activity for the BHHW Bank Account:[9]

| Month | Deposits | Withdrawals/Fees | Record |
|-------|----------|------------------|--------|
| *November 2014* | $5,889.59 | $6,167.87 | Plaintiff's Ex. 108 at 1-6 |
| *December 2014* | $41,539.86 | $40,986.99 | Plaintiff's Ex. 108 at 7-14 |
| *May 2015* | $30,057.55 | $31,457.58 | Plaintiff's Ex. 84 |
| **2014 Total:** | $47,429.45 | $47,154.86 | |
| **2015 Total:** | $30,057.55 | $31,457.58 | |

The bank statements admitted into evidence reflect the following activity for the Joint Effort Bank Account:[10]

| Month | Deposits | Withdrawals/Fees | Record |
|-------|----------|------------------|--------|
| *January 2014* | $12,959.79 | $13,621.91 | Plaintiff's Ex. 106 at 1-8 |
| *February 2014* | $25,805.29 | $25,381.50 | Plaintiff's Ex. 106 at 9-18 |
| *March 2014* | $23,726.99 | $25,174.34 | Plaintiff's Ex. 106 at 19-28 |
| *April 2014* | $30,398.80 | $29,832.79 | Plaintiff's Ex. 106 at 29-38 |
| *May 2014* | $35,401.80 | $35,934.26 | Plaintiff's Ex. 106 at 39-48 |
| *June 2014* | $48,332.45 | $47,131.59 | Plaintiff's Ex. 107 at 1-12 |
| *July 2014* | $45,388.51 | $39,598.79 | Plaintiff's Ex. 107 at 13-25 |
| *August 2014* | $21,609.16 | $28,943.42 | Plaintiff's Ex. 107 at 25-34 |
| *September 2014* | $222.36 | $238.00 | Plaintiff's Ex. 107 at 35-38 |

---

[9] *See* Trial Tr., March 2 at 128:20-25.
[10] *See* Trial Tr., March 2 at 167:11-168:10.

**MEMORANDUM OF DECISION**

| Month | Deposits | Withdrawals/Fees | Record |
|-------|----------|------------------|--------|
| *October 2014* | $1,676.64 | $204.00 | Plaintiff's Ex. 107 at 39-42 |
| **2014 Total:** | $245,521.79 | $246,060.60 | |

Thus, in 2014, the total amount of deposits in both accounts was $292,951.24 and the total in withdrawals and fees was $293,215.46. The only statement from 2015 was the May 2015 statement for the BHHW Bank Account, which shows $30,057.55 in deposits and $31,457.58 in withdrawals and fees in May 2015.

Plaintiff took the deposition of Lori Milas of Westshore Medical Billing, Inc. ("Westshore"), and the deposition transcript was admitted into evidence as Plaintiff's Exhibit 91 ("Depo. Tr.").[11] Westshore is a medical billing service specializing in workers' compensation collection. Depo. Tr. at 10:19-25. Defendant hired Westshore to bill and to collect on certain older accounts receivable from April to October 2014. *Id.* at 12:7-11, 13:15-21, 15:4-15, 26:6-9.; Trial Tr., March 5 at 33:4-10. Westshore apparently terminated its relationship with Defendant because he was not paying the invoices as they came due. Depo. Tr. at 21:3-20, 26:10-27:2. Westshore sued Defendant in state court to collect on $9,271.35 in outstanding invoices and eventually obtained a judgment against him. *Id.* at 14:18-15:15, 28:8-17; *see* Ex. 7 to Depo. Tr.

In connection with Westshore's services, Defendant executed a service agreement revised on April 8, 2014, and executed on April 14, 2014 (the "Service Agreement"). Ex. 103 to Depo. Tr.; *see* Depo. Tr. at 22:12-15; *see* Trial Tr., March 2 at 131:12-19. The Service Agreement defines "client" as "Mike Shapow PhD, RPT." *See* Ex. 103 to Depo. Tr. at 1. However, the signature block indicates that Defendant signed the Service Agreement as "president," though it does not specify the entity for which he serves as president. *See id.* at 4. Defendant testified that the Service

---

[11] A portion of the transcript includes purported "testimony" of an individual named Teresa Gallaher, whom Milas identified as Westshore's office manager. *See* Depo. Tr. at 39:9-11. According to the transcript, Gallaher entered the deposition room and Plaintiff's counsel began to ask her questions as if she was testifying under oath. *See id.* at 40:17-41:14, 43:12-21, 45:20-46:5, 46:16-47:22. At one point, Plaintiff's counsel and the court reporter discussed whether Gallaher would give an oath to testify truthfully, and the reporter said she would need to start a new deposition transcript for Gallaher. *See id.* at 49:25-50:10 Rule 603 of the Federal Rules of Evidence provides, "Before testifying, a witness must give an oath or affirmation to testify truthfully." Fed. R. Evid. 603. Accordingly, the Court will not consider the statements attributed to Gallaher in the deposition transcript. To the extent Gallaher was relied upon to authenticate any exhibits to the deposition transcript, the authenticity of those documents is not in question because Defendant's counsel stipulated at trial to the admission of all exhibits to the deposition transcript. Trial Tr., March 2 at 43:1-7.

**MEMORANDUM OF DECISION**

1    Agreement was made on behalf of Joint Effort Medical Wellness, that Joint Effort Medical

2    Wellness owned the subject accounts receivable, and that it was his understanding when he signed

3    the Service Agreement that he did so on behalf of Joint Effort Medical Wellness.  Trial Tr., March

4    2 at 131:12-23; Trial Tr., March 5 at 27:10-28:8, 32:12-23.

5        Westshore produced an aging report that it compiled listing certain accounts receivable that

6    Defendant hired Westshore to collect (the "Aging Report").  Ex. 100 to Depo. Tr.; *see* Depo. Tr. at

7    17:11-16, 18:3-19, 19:11-20; 29:7-19; Trial Tr., March 5 at 49:7-22.  Only a portion of the

8    accounts for which Westshore did the billing or collections were listed in the Aging Report.  Depo.

9    Tr. at 51:13-52:24, 53:15-54:1; *see* Ex. 108 to Depo. Tr.  The header of the Aging Report indicates

10   that the client is "Joint Effort."  *See* Ex. 100 to Depo. Tr.  The total amount of accounts receivable

11   listed in the Aging Report that Westshore was hired to collect, was $1,025,875.  *See id.* at 6; Depo.

12   Tr. at 29:7-19; Trial Tr., March 2 at 133:18-134:1.  Milas testified that Defendant has never

13   questioned the accuracy of Westshore's invoices.  Depo Tr. at 32:9-16.  Defendant sent Westshore

14   two forms that would enable it to access his billing software.  Ex.107 to Depo. Tr.; *see* Depo Tr. at

15   50:21-51:3.  Neither of those forms lists Defendant as a service provider; one lists "Joint Effort

16   Medical Wellness," and the other lists "BKP Wellness."  *See* Ex. 107 to Depo. Tr. at 2, 3.

17       Milas testified that she did not know whether Defendant operated through any corporations

18   or whether he made any representations to her about who owned the accounts receivable that

19   Westshore was hired to collect.  Depo. Tr. at 21:21-22:2.  Milas did opine, however, that

20   "[a]ccording to the [S]ervice [A]greement," Defendant owned the accounts.  *Id.* at 22:12-15.[12]  She

21   also emphasized how important it is that her clients had not factored or sold their accounts

22   receivable to anyone else prior to retaining Westshore's services.  *Id.* at 22:16-23:13.  Further, even

23   though Milas testified that she did not know whether Defendant made any representations about

24   who owned the accounts receivable, *see id.* at 21:24-22:2, she responded affirmatively when asked

25   whether she relied on such a representation when she agreed to work with Defendant, *id.* at 22:12-

26   19.  Milas also opined that the power of attorney provision in the Service Agreement included a

27   _____

28   [12] Milas is not qualified as a legal expert for purposes of Rule 702 of the Federal Rules of Evidence, and such technical
opinion testimony by a lay witness is not admissible under Rule 701(c).

*(Continued...)*

**MEMORANDUM OF DECISION**

1    representation that Defendant owned the accounts receivable "free and clear."  *See id.* at 22:19-

2    23:1.[13]

3          All the invoices that Westshore sent for collections done on behalf of Defendant were

4    invoiced to "Joint Wellness Medical Center."  Depo. Tr. at 21:3-20; Exs. 101, 102 to Depo. Tr.[14]

5    Milas believed that Defendant operated under the trade names "Joint Efforts Physical Therapy" and

6    "Joint Wellness Medical Center" and that Defendant used these names on his office billing

7    statements and letterhead.  Ex. 7 to Depo. Tr.; *see* Depo. Tr. at 23:14-25:18.

8          Defendant testified that as of the Petition Date, the accounts receivable that he hired

9    Westshore to collect in April 2014 were property of an entity named Epic Medical Management,

10   LLC ("Epic"), as a result of a judgment it obtained against Joint Effort Medical Wellness in state

11   court.  Trial Tr., March 2 at 134:5-17, 142:19-21; Trial Tr., March 5 at 73:9-21.  Defendant

12   produced a copy of a state court default judgment for $135,485.99 in favor of Epic, against Joint

13   Effort Medical Wellness, lodged on March 27, 2014, and entered on April 2, 2014.  *See*

14   Defendant's Ex. O; Trial Tr., March 9 at 8:10-10:8.  He testified that he turned over the subject

15   accounts receivable to Epic as a result of the default judgment it obtained against Joint Effort

16   Medical Wellness.  Trial Tr., March 5 at 33:16-34:6.

17       **C.    Business Entities With Which Defendant is Affiliated**

18          Defendant has compiled an extensive and entangled list of business entities with which he

19   has been affiliated.  He testified that he operated different segments of his business under different

20   but related fictitious names because each entity pertained to a different practice or different client

21   base (e.g., workers' compensation, personal injury, or HMO).  Trial Tr., March 2 at 83:18-84:12,

22   170:12-171:24; *see* PTS at 3, ¶ 6.  In the Pre-Trial Stipulation, Defendant admitted to owning,

23   controlling, or having an interest in the following corporate entities:

24   • Total Wellness Rehabilitation, Inc. (C2617599), *see* PTS at 3, ¶ 7.ii;

25   • Total Wellness Rehabilitation II (C3533554), *see* PTS at 3, ¶ 7.i; *id.* at 7, ¶ 2.2;

---

26   [13] The power of attorney provision contains no such representation.  *See* Ex. 103, ¶ 5.  Rather, it grants Westshore the
27   right to collect on behalf of the client.  *See id.*  The Court will not consider Milas' legal conclusions since she is not
     qualified as a legal expert.  *See supra* note 12.

28   [14] Defendant testified that this was an error by Westshore because the entity's name was actually "Joint Effort Medical
     Wellness."  Trial Tr., March 5 at 31:1-32:11.

**MEMORANDUM OF DECISION**

1    • Beverly Hills Health Works (C2200188), *see* PTS at 3, ¶ 7.ii; *id.* at 7, ¶ 2;

2    • Beverly Hills Health Works II (C3533555), *see* PTS at 7, ¶ 2.1;

3    • BKP Wellness, *see* PTS at 3, ¶ 7.iii; Trial Tr., March 2 at 114:2-5;

4    • Joint Effort Wellness, *see* PTS at 3, ¶ 7.iv; Trial Tr., March 2 at 88:25-89:2; and

5    • Gratto Aquatic Rehab, *see* PTS at 3, ¶ 7.v; Trial Tr., March 2 at 162:1-22, 166:11-167:10.

6        **1.    Disclosures in Defendant's First Bankruptcy Case**

7        On the Schedule B filed in Defendant's First Bankruptcy Case on December 26, 2012, in

8    response to item 13 regarding stock and interests in incorporated and unincorporated businesses,

9    Defendant listed a 100% ownership interest in four entities with the following parentheticals:

10    "Total Wellness Rehabilitation (corporation presently suspended)"; "Joint Effort Medical Wellness

11    (corporation presently suspended)"; "Beverly Hills Health Works (corporation presently

12    suspended)"; and "Mike Shapow, Registered Physical Therapist, Inc. (corporation never operated;

13    suspended)."  Plaintiff's Ex. 44 at 2; *see* Case No. 2:12-bk-50729-NB, Dkt. 9 at 8.[15]  Defendant

14    testified that those four entities held no accounts receivable as of the petition date in Defendant's

15    First Bankruptcy Case.  Trial Tr., March 5 at 49:23-50:10.  Defendant testified that "Mike Shapow,

16    Registered Physical Therapist, Inc." never operated, never billed for Defendant's services, held no

17    accounts receivable, and had no assets.  Trial Tr., March 5 at 66:9-67:2.

18        **2.    Initial Disclosures in This Bankruptcy Case**

19        In this case, Defendant originally filed his schedules, SOFA, and other case commencement

20    documents on December 14, 2015.  *See* Case Dkt. 9; Plaintiff's Exs. 60-62.  In response to item 13

21    on Schedule B regarding stock and interests in incorporated and unincorporated businesses,

22    Defendant listed only a 100% ownership interest in "Beverly Hills Health Works."  Plaintiff's Exs.

23    60 at 2, 61 at 8.[16]  On his original SOFA, in response to item 18 regarding businesses the debtor

24

---

25    [15] Similarly, Defendant testified on December 15, 2014, in his State Court Judgment debtor examination conducted by
Plaintiff that, as of December 15, 2014, he had not transferred away any ownership interest in Total Wellness
26    Rehabilitation, Joint Effort Medical Wellness, Beverly Hills Health Works, or Mike Shapow, Registered Physical
Therapist, Inc.  Plaintiff's Ex. 69-C at 18:4-19:19.  He also testified, however, that he was not sure there was anything
to own because these entities were no longer operating.  Plaintiff's Ex. 69-C at 24:18-24.

27    [16] Defendant testified on December 15, 2014, in his State Court Judgment debtor examination conducted by Plaintiff
that (1) there was no relationship between Beverly Hills Health Works and Total Wellness Rehabilitation, Inc.; and
28    (2) he had no ownership interest in Beverly Hills Health Works and he simply worked there.  Plaintiff's Ex. 69-C at
15:23-16:6.

**MEMORANDUM OF DECISION**

1   had control over or conducted business through, Defendant listed "Total Wellness Rehabilitation,"

2   "Beverly Hills Health Works," and "Joint Effort Medical."  Plaintiff's Exs. 61, 62 at 32.  He

3   indicated that Total Wellness Rehabilitation and Joint Effort Medical were "currently suspended"

4   and provided an "ending date" of 2013 for both businesses.  *See id.*

5              **3.    Amended Schedule B and SOFA and Gratto Aquatic Rehab**

6              On November 21, 2017, Defendant amended his Schedule B and SOFA.  *See* Case Dkt. 56;

7   Defendant's Ex. N.  He amended his response to item 13 on Schedule B to reflect a 30% ownership

8   interest in Gratto Aquatic Rehab, Inc. ("Gratto Aquatic"), which was apparently formed in June

9   2015 and had no assets on the Petition Date.  Defendant's Ex. N at 3.  He also amended his

10  response to item 18 on his SOFA to add Gratto Aquatic.  *See id.* at 11.  Defendant testified that he

11  did not initially list Gratto Aquatic on his Schedule B and SOFA because it had no assets or value

12  as of the Petition Date and had only recently been formed.  Trial Tr., March 2 at 73:12-18, 162:1-

13  11, 165:7-14; Trial Tr., March 5 at 36:13-24; Trial Tr., March 9 at 57:11-25, 59:5-11, 62:12-20.

14  He testified that his failure to list Gratto Aquatic on his schedules was "unintentional."  Trial Tr.,

15  March 5 at 36:22-24.  Defendant is one of three shareholders of Gratto Aquatic, but he is not the

16  chief operating officer.  Trial Tr., March 2 at 162:12-22, 164:22-165:6, 166:14-167:10.  Defendant

17  testified that Gratto Aquatic was formed to facilitate a contract for him to provide aquatic therapy

18  at a spa on North La Brea Avenue in Los Angeles, named Grotto del Sal, that had pools of salt

19  water from the Dead Sea in Israel.  Trial Tr., March 2 at 162:9-11, 165:15-22; Trial Tr., March 9 at

20  58:16-59:23.

21

22

23

24

25

26

27

28

**MEMORANDUM OF DECISION**

**4.    Other Entities**

Defendant testified that Joint Effort Medical Wellness had a negative net worth on the Petition Date because of judgments held against the company by Epic, the Franchise Tax Board, and Century City Medical Plaza (another judgment creditor).  Trial Tr., March 5 at 35:14-36:8, 73:9-74:1; *see* PTS at 4, ¶ 11.

"Beverly Hills Health Works" was a name under which Defendant or his entities conducted business in 2013.  Trial Tr., March 2 at 123:10-13.  Defendant directed his staff person, Valerie Saenz, to incorporate Beverly Hills Health Works II in February 2013.  Trial Tr., March 2 at 123:14-16.

Defendant estimated that Joint Effort Medical Wellness "stopped doing business" approximately four or five years before the trial date, sometime before Defendant's First Bankruptcy Case.  Trial Tr., March 5 at 68:17-69:10.  Defendant differentiated between "doing business" and continuing to collect checks and making deposits into the bank accounts.  Trial Tr., March 9 at 28:16-24.  He explained that accounts receivable and mail continue to come in after a company stops doing business.  Trial Tr., March 9 at 65:12-67:5.  He testified that he kept the fictitious name "Joint Effort Medical Wellness" so he could continue to collect on bills and receive mail.  Trial Tr., March 9 at 81:19-82:4.  Many of Joint Effort's receivables were uncollectable, and others were turned over to Epic as a result of its judgment.  Trial Tr., March 5 at 74:7-20.

Plaintiff moved into evidence a screenshot of the website for Joint Effort Medical Wellness that included the date January 4, 2017, at the bottom of the page.  Plaintiff's Ex. 96.  Defendant testified that notwithstanding the date shown on the screenshot, Joint Effort Medical Wellness had stopped doing business in 2013, and the website's continued availability would have been a mistake.  Trial Tr., March 9 at 72:15-73:1, 74:4-9, 75:23-76:20, 79:7-18.  Defendant does not do his own web development, he pays a monthly fee to a third party to modify the website for him, and he believes the website was taken down in early 2017.  Trial Tr., March 9 at 92:6-94:15.  However, he failed to explain why the website was updated to display the new address of his business but not to remove the name of the supposedly discontinued Joint Effort Medical Wellness. *See* Trial Tr., March 9 at 79:22-81:22.

**MEMORANDUM OF DECISION**

At first, Defendant testified that the paperwork he presented to his clients still read "Joint Effort Medical Wellness" as late as 2015 or 2016.  Trial Tr., March 9 at 96:3-11, 97:21-24.  He later changed his story and said that the paperwork would have included only the name of Beverly Hills Health Works at that time.  Trial Tr., March 9 at 98:3-14.

Defendant testified that he was a part owner of BKP Wellness.  Trial Tr., March 2 at 114:2-6.  BKP Wellness ceased doing business under its own name in 2007 and instead operated under the fictitious business name "Total Wellness Rehabilitation," at the request of Defendant's former business partner, Brian Padveen.  Trial Tr., March 2 at 117:7-118:9, 128:3-6; Plaintiff's Ex. 26.

### 5.    Entities Renamed With "II"

Defendant listed in his bankruptcy schedules Beverly Hills Health Works, Joint Effort Medical Wellness, and Total Wellness Rehabilitation (the "Series I Entities"), but he did not list Beverly Hills Health Works II, Joint Effort Medical Wellness II, or Total Wellness Rehabilitation II (the "Series II Entities").  Defendant testified that when he amended his Schedule B, he did not separately list the Series II Entities because he believed those entities were the same as the respective Series I Entities.  Trial Tr., March 9 at 89:24-90:20; *see* Defendant's Ex. N. at 11.  Defendant testified that he did not list Total Wellness Rehabilitation II in his SOFA because he believed Total Wellness Rehabilitation was the same entity as Total Wellness Rehabilitation II.  Trial Tr., March 2 at 73:1-8, 111:17-112:7, 128:7-10; Trial Tr., March 9 at 62:21-63:10, 83:5-16.  He testified that the same was true of Beverly Hills Health Works, Trial Tr., March 2 at 111:17-112:7, 128:11-13; Trial Tr., March 9 at 63:25-64:13, and of Joint Effort Medical Wellness.  Trial Tr., March 2 at 111:17-22; Trial Tr., March 9 at 30:16-31:7, 33:1-9, 64:14-19.

On May 6, 2013, Defendant executed a Certificate of Amendment of Articles of Incorporation for Beverly Hills Health Works, C3533555, which changed the corporation's name to "Beverly Hills Health Works II."  Trial Tr., March 2 at 120:9-21; Plaintiff's Ex. 36.  Also, on May 6, 2013, Defendant executed a Certificate of Amendment of Articles of Incorporation for Total Wellness Rehabilitation, C3533554, which changed the corporation's name to "Total Wellness Rehabilitation II."  Trial Tr., March 2 at 64:5-23, 126:24-127:21; Plaintiff's Exs. 20, 40.  These documents were filed with the California Secretary of State on May 31, 2013.  Trial Tr., March 2 at

120:19-21; *see* Plaintiff's Exs. 20, 36, 40.  Total Wellness Rehabilitation II and Beverly Hills Health Works II issued no share certificates.  Trial Tr., March 2 at 63:10-12, 64:2-4; Plaintiff's Exs. 20, 36, 40.  Defendant also testified that he changed the name of Total Wellness Rehabilitation to Total Wellness Rehabilitation II in May 2013.  Trial Tr., March 2 at 113:4-7.  When he was asked why he amended the articles of incorporation to change the name of Total Wellness Rehabilitation to Total Wellness Rehabilitation II, Defendant testified, "I had a Franchise Tax Board lien that I couldn't operate, and I just had to form another corporation.  I couldn't make a living."  Trial Tr., March 2 at 64:11-17.  Defendant later said he had changed the names of both Total Wellness Rehabilitation and Beverly Hills Health Works because his business associate, Brian Padveen, left the business.  Trial Tr., March 2 at 119:2-4, 128:2-10.  Defendant testified that he changed the name of Joint Effort Medical Wellness to add "II" to the end of the name because of the Franchise Tax Board lien.  Trial Tr., March 2 at 168:21-24.  When he was asked, "[O]ther than delaying, making it harder for someone to levy on the bank account, what reason would you have for changing the name?," Defendant responded, "No other reason."  Trial Tr., March 2 at 169:15-18.

### D.    The Car Driven by Defendant

In response to item 25 on Defendant's Schedule B, regarding automobiles and other vehicles, Defendant wrote the following under "Description and Location of Property": "Debtor's residence: 2013 Toyota FJ Cruiser with 20,000 miles.  The Debtor does not own the vehicle but makes the monthly payments."  Plaintiff's Ex. 61 at 9.  Defendant testified further that his father owns the vehicle (the "FJ Cruiser"), but Defendant makes the payments.  Trial Tr., March 2 at 161:5-17.  The parties stipulated at trial, and the Plaintiff offered into evidence an online vehicle record showing, that Defendant's father, Nathan Shapow, is the record title holder of the FJ Cruiser.  Trial Tr., March 5 at 23:19-23; Plaintiff's Ex. 83.  Defendant testified that his father is "handicapped," so his father bought the FJ Cruiser and paid the down payment so Defendant could drive him around.  Trial Tr., March 5 at 26:7-27:6.  Defendant also uses the FJ Cruiser to drive himself around without his father.  Trial Tr., March 5 at 54:12-19.

**MEMORANDUM OF DECISION**

**E.     Defendant's Residence**

Defendant currently lives in a condominium at 10350 Wilshire Boulevard, Suite 703, Los Angeles, California 90024 (the "Wilshire Condominium").  Trial Tr., March 2 at 97:9-15, March 5 at 18:23-19:2.  Prior to that, he lived at 3183 Abington Drive, Beverly Hills, California 90210 (the "Abington Property").  Trial Tr., March 2 at 97:5-8.  Defendant testified that he listed neither the Wilshire Condominium nor the Abington Property on his bankruptcy schedules because he did not own the properties.  Trial Tr., March 5 at 19:18-20:9, 27:3-6.  Defendant's parents at times lived at the Wilshire Condominium and at the Abington Property with Defendant, but they no longer live with him.  Trial Tr., March 5 at 54:23-55:11.

The record title holder of the Wilshire Condominium is an entity named Java, LLC ("Java").  Trial Tr., March 2 at 151:14-17; Trial Tr., March 9 at 108:2-4.  Java also owned the Abington Property.  Trial Tr., March 5 at 17:5-8; *see* Defendant's Ex. Q.  While Plaintiff contends that Defendant is the true owner of the Wilshire Condominium, Defendant testified that Java is the 100% owner.  Trial Tr., March 5 at 19:21-20:4.  Defendant testified that Java is owned by his father, Nathan Shapow, his late mother, Hela Shapow, previously co-owned Java with her husband, and Defendant has never held an ownership interest in Java, even though he was at one point the agent for service of process.  Trial Tr., March 2 at 151:14-24, 156:14-20, 159:6-12, Trial Tr., March 5 at 17:2-17.  Plaintiff produced a copy of Java's statement of information filed with the California Secretary of State on October 14, 1999, which Defendant acknowledged signing as manager and agent for service of process.  Plaintiff's Ex. 9; Trial Tr., March 2 at 157:9-158:9.  To Defendant's knowledge, Java's only business was owning the Abington Property (and later the Wilshire Condominium).  Trial Tr., March 2 at 158:3-5.

The Abington Property was sold several years before this bankruptcy case was initiated.  Trial Tr., March 5 at 18:14-16.  Java apparently acquired the Wilshire Condominium in a 1031 exchange for the Abington Property.  Trial Tr., March 2 at 158:23-159:2, March 5 at 18:20-19:4; Defendant's Ex. Q.  Defendant testified that his father allows him to live in the Wilshire Condominium.  Trial Tr., March 5 at 19:5-7.  He testified that, while he used to pay rent on the Abington Property, he does not pay rent on the Wilshire Condominium, and he pays only the

-17-

**MEMORANDUM OF DECISION**

1   homeowners' association fees.  Trial Tr., March 2 at 159:13-25, March 5 at 20:10-12.  He does not

2   have a lease agreement or anything in writing memorializing this arrangement, but he did have a

3   lease agreement for the Abington Property.  Trial Tr., March 5 at 55:12-56:5.

4         Defendant's stepson, Roy Silver, corroborated Defendant's testimony about the Wilshire

5   Condominium and Java.  *See* Trial Tr., March 9 at 100:25-117:21.  Silver testified that Defendant's

6   father, Nathan Shapow, is the 100% owner of Java, Defendant has no ownership interest in Java,

7   and Silver manages Java.  Trial Tr., March 9 at 102:7-23.  Silver testified that the original members

8   of Java were Defendant's father, Nathan Shapow, and late mother, Hela Shapow, and that Silver is

9   the only manager of Java.  Trial Tr., March 9 at 104:12-105:19.  Java's operating agreement was

10  offered by Defendant to corroborate Silver's testimony.  Defendant's Ex. P; *see* Trial Tr., March 9

11  at 105:22.  Silver testified that he signed the paperwork for the 1031 exchange of the Abington

12  Property for the Wilshire Condominium, that all the proceeds from the sale of the Abington

13  Property went to the purchase of the Wilshire Condominium, and that Defendant received none of

14  the proceeds for himself.  Trial Tr., March 9 at 106:2-111:3; *see* Defendant's Exs. A, Q.

15        Plaintiff produced a copy of a mechanic's lien in the amount of $3,336.76 in favor of Tri-

16  Tech Restoration Company, Inc., recorded against the Abington Property on May 13, 2010.

17  Plaintiff's Ex. 15.  The mechanic's lien states, "The owners and reputed owners of the property

18  is/are Mike Shapow 31833 [sic] Abington Dr., Beverly Hills, CA 90210."  *See id.*  The Defendant

19  recalled having a mold problem at the Abington Property and possibly hiring Tri-Tech Restoration,

20  but he testified that he never would have told someone that he owned the Abington Property

21  because he did not own it.  Trial Tr., March 2 at 153:13-155:18, March 5 at 16:10-24.

22        Plaintiff's principal, Gary Grabel, testified that in approximately 2009 when Defendant

23  occupied Plaintiff's property, Grabel and Defendant had a conversation about the manner in which

24  one should hold title to real property, and Defendant said Grabel should hold title to his real

25  property in the name of a limited liability company or a corporation to avoid creditors.  *See* Trial

26  Tr., March 2 at 17:8-22:3.  Defendant disputes that this conversation ever took place.  Trial Tr.,

27  March 5 at 13:2-10.

28

**MEMORANDUM OF DECISION**

## IV.    ANALYSIS

"In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge." *Retz v. Samson (In re Retz)*, 606 F.3d 1189, 1196 (9th Cir. 2010) (quoting *Bernard v. Sheaffer (In re Bernard)*, 96 F.3d 1279, 1281 (9th Cir. 1996)). The party objecting to a debtor's discharge bears the burden of proving by a preponderance of the evidence that the debtor's discharge should be denied. *See* Fed. R. Bankr. P. 4005; *Khalil v. Developers Sur. & Indem. Co. (In re Khalil)*, 379 B.R. 163, 172 (B.A.P. 9th Cir. 2007). To satisfy the preponderance of evidence standard, the objecting party must "persuade the finder of fact that the proposition is more likely true than not." *In re Arnold & Baker Farms*, 177 B.R. 648, 654 (B.A.P. 9th Cir. 1994), *aff'd*, 85 F.3d 1415 (9th Cir. 1996).

### A.    Ownership of Accounts Receivable

The principal focus of Plaintiff's case is the allegation that Defendant personally owned accounts receivable on or before the Petition Date, notwithstanding his testimony that he did all his billing through business entities, and his omission of his alleged ownership interest in such accounts from his schedules should support a claim under section 727(a)(4)(A). Alternatively, Plaintiff asserts that the accounts receivable in favor of Defendant's business entities and the entities' bank accounts should be deemed Defendant's assets for purposes of section 727 because the entities are Defendant's alter egos. As discussed below, Plaintiff failed to prove that Defendant personally owned any accounts receivable, and Plaintiff's alter ego claim fails as a matter of law.

"Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th 523, 538 (2000). A corporation's shareholder does not hold legal title to the corporation's assets. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474-75 (2003) ("A basic tenet of American corporate law is that the corporation and its shareholders are distinct entities. An individual shareholder, by virtue of his ownership of shares, does not own the corporation's assets . . . .") (citations omitted); *United States v. Bennett*, 621 F.3d 1131, 1136 (9th Cir. 2010) ("As early as 1926, the Supreme Court recognized that '[t]he owner of

**MEMORANDUM OF DECISION**

1  the shares of stock in a company is not the owner of the corporation's property.'  While the

2  shareholder has a right to share in corporate dividends, he does not own the corporate property.'")

3  (alteration in original) (citation omitted) (quoting *R.I. Hosp. Trust Co. v. Doughton*, 270 U.S. 69,

4  81 (1926)).

5        "It is well accepted that a filing by an individual who is an owner of a corporation brings

6  into the estate only his ownership interest and not the assets of the corporation."  *In re Young*, 409

7  B.R. 508, 513 (Bankr. D. Idaho 2009); *see also* 2 Collier on Bankruptcy ¶ 101.30[3] (16th ed.

8  2018) ("[W]hile the individual's interest in the partnership or corporation (which could be a 100

9  percent interest) would be property of the estate, the assets of the partnership or corporation itself

10  would not be."); *Cambridge Tempositions, Inc. v. Cassis (In re Cassis)*, 220 B.R. 979, 983 (Bankr.

11  N.D. Iowa 1998) ("Ownership of stock in a corporation does not mean that the corporation is

12  property of the estate. . . .  Technical, legal distinctions between corporations and shareholders will

13  be respected in bankruptcy cases."); *UST v. Crabtree (In re Crabtree)*, 554 B.R. 174, 192 (Bankr.

14  D. Minn. 2016) ("As a general matter, property of the estate does not include assets owned by a

15  corporation in which the debtor holds an interest.") *rev'd on other grounds,* 562 B.R. 749 (B.A.P.

16  8th Cir. 2017).

17        Plaintiff failed to prove that the accounts receivable at issue were not assets of Defendants'

18  entities and that they were actually assets of Defendant individually.  Plaintiff failed to provide

19  evidence to contradict Defendant's testimony that he does not personally bill for his physical

20  therapy services, that he has billed through business entities since as early as 2011, and he did not

21  list an ownership interest in accounts receivable on his bankruptcy schedules because he did not

22  personally own accounts receivable on the Petition Date.  Plaintiff presented nothing to undermine

23  Defendant's testimony that only his companies have NPIs and he does not personally have his own

24  NPI.

25        Plaintiff's primary evidence on the issue of ownership of accounts receivable was the

26  deposition testimony of Lori Milas of Westshore, which demonstrates only Westshore's confusion

27  about the issue of ownership of the accounts receivable.  Milas testified that she did not know

28  whether Defendant operated through any corporations or whether he made any representations to

**MEMORANDUM OF DECISION**

1    her about who owned the accounts receivable that Westshore was hired to collect.  Depo. Tr. at

2    21:21-22:2.  However, shortly thereafter she responded affirmatively when asked whether she

3    relied on such a representation when she agreed to work with Defendant.  *Id.* at 22:12-19.  Milas

4    also opined that "[a]ccording to the [S]ervice [A]greement," Defendant owned the accounts, *id.* at

5    22:12-15, and that the power of attorney provision in the Service Agreement included a

6    representation that Defendant owned the accounts receivable "free and clear," *see id.* at 22:19-23:1.

7    The Court must disregard Milas' legal conclusions because Milas is not qualified as a legal expert

8    for purposes of Rule 702 of the Federal Rules of Evidence, and a technical opinion testimony by a

9    lay witness is not admissible under Rule 701(c).  Moreover, the power of attorney provision

10   contains no representation that Defendant personally owned the accounts receivable; rather, it

11   grants Westshore the right to collect on behalf of the client.  *See* Ex. 103 to Depo. Tr., ¶ 5.  And

12   while the Service Agreement defines "client" as "Mike Shapow PhD, RPT," *see* Ex. 103 to Depo.

13   Tr. at 1, the signature block indicates that Defendant signed as "president" (though it does not

14   specify the entity of which he is president), *see id.* at 4.

15        Moreover, the other documents from the deposition indicate that Westshore was collecting

16   on behalf of different corporations, not on behalf of Defendant as an individual.  For example, the

17   header of the Aging Report shows that the client is "Joint Effort."  *See* Ex. 100 to Depo. Tr.  The

18   billing software forms sent by Defendant to Westshore do not list Defendant as a service provider;

19   one lists "Joint Effort Medical Wellness," and the other lists "BKP Wellness."  *See* Ex. 107 to

20   Depo. Tr. at 2, 3; *see also* Depo Tr. at 50:21-51:3.  All the invoices that Westshore sent for

21   collections done on behalf of Defendant were invoiced to "Joint Wellness Medical Center."  Depo.

22   Tr. at 21:3-20; Exs. 101, 102 to Depo. Tr.  Milas believed that Defendant operated under the trade

23   names "Joint Efforts Physical Therapy" and "Joint Wellness Medical Center" and that Defendant

24   used these names on his office billing statements and letterhead.  Ex. 7 to Depo. Tr.; *see* Depo. Tr.

25   at 23:14-25:18.  Milas' testimony and the exhibits to the Deposition Transcript simply fail to

26   provide evidence that Defendant personally owned any accounts receivable.

27        Plaintiff also failed to present any evidence undermining Defendant's testimony that he does

28   not personally have an NPI, the unique number required for a health care provider to bill an

**MEMORANDUM OF DECISION**

1    insurance company.  *See* Trial Tr., March 9 at 11:13-12:8.  He testified that all his clients paid by

2    insurance during the relevant time period, Trial Tr., March 9 at 13:3-8, and only the companies

3    through which he billed had NPIs, Trial Tr., March 9 at 12:9-14:10.

4        Accordingly, because Plaintiff failed to prove Defendant's ownership of accounts

5    receivable, the Court cannot find that Defendant personally owned any accounts receivable as of

6    the Petition Date.

7        Plaintiff alternatively seeks to impute ownership of the accounts receivable on Defendant

8    using alter ego liability.  There are three methods of disregarding the corporate form to "pierce the

9    corporate veil."  *See Postal Instant Press, Inc. v. Kaswa, Corp.*, 162 Cal. App. 4th 1510, 1518

10   (2008).  Traditionally, a court may apply the alter ego doctrine and pierce the corporate veil so that

11   a "shareholder [is] held liable for the debts or conduct of the corporation."  *Id.*  Second, "[s]ome

12   courts recognize [that] the corporate veil may be pierced in reverse so that a corporation may be

13   held liable for the debts or conduct of a shareholder."  *Id.*  Reverse piercing typically involves a

14   "corporate insider . . . attempting to pierce the corporate veil from within so that the corporate

15   entity and the individual will be considered one and the same."  *Id.* (quoting 1 Fletcher Cyclopedia

16   of the Law of Corporations (Sept. 2007) § 41.70) (internal quotations omitted).  This is referred to

17   as "inside reverse piercing."  *Id.*

18       The third method, relevant here, is "sometimes called 'outside' or 'third party' reverse

19   piercing, [and it] occurs when a third party outsider seeks to reach corporate assets to satisfy claims

20   against an individual shareholder."  *Id.* (citing *In re Phillips*, 139 P.3d 639, 645 (Colo. 2006)).  At

21   least one California Court of Appeal has held that California law does not permit outside reverse

22   piercing to reach the assets of a corporation, *see Postal Instant Press, Inc. v. Kaswa, Corp.*, 162

23   Cal. App. 4th at 1521, and characterized it as a "radical and problematic change in standard alter

24   ego law," *id.*  Other courts have followed *Postal Instant Press*, including a federal district court

25   from this district that described the outside reverse piercing doctrine as follows:

26           While reverse piercing and the traditional alter ego doctrine have similar
             goals, the doctrines achieve those goals in a very different manner.
27           [*Postal Instant Press, Inc.*, 162 Cal. App. 4th] at 1522.  "Traditional
             piercing of the corporate veil is justified as an equitable remedy when the
28           shareholders have abused the corporate form to evade individual liability,

-22-

**MEMORANDUM OF DECISION**

circumvent a statute, or accomplish a wrongful purpose." *Id.* Outside
reverse piercing does not seek to remedy the misuse of the corporate form
to shield the individual shareholder. *See id.* at 1523. "Rather, the issue
addressed by outside reverse piercing is the shareholder's transfer of
personal assets to the corporation to shield the assets from collection by a
creditor of the shareholder. In other words, outside reverse piercing seeks
to protect the judgment creditor from the shareholder's fraudulent transfer
of assets to the corporation." *Id.* While some courts have applied outside
reverse piercing, California courts recognize that such a remedy is "an
unacceptable shortcut" because "conversion and fraudulent conveyance
already afford judgment creditors an adequate remedy." *Id.*

*Greiling v. Zahoudanis*, No. CV 08-06467 ODW (ANx), 2009 WL 700049, at *3 (C.D. Cal. Mar.

13, 2009); *accord Leslie v. Bartamian (In re Mihranian)*, BAP No. CC-16-1378, 2017 WL

2775043, at *6 (B.A.P. 9th Cir. June 29, 2017) ("at least one California Court of Appeal has held

that California law does not permit 'outside reverse piercing of the corporate veil'—piercing in

order to make the corporation's assets liable for the debts of the individual shareholder(s) [(citing

*Postal Instant Press*).] That is precisely what [plaintiff] is attempting to do here: claim the assets

of [the corporation] as if they belonged to [the defendant] individually and his bankruptcy estate.");

*Gill v. Shakib (In re Shakib)*, No. 2:13-bk-26638-TD, 2014 WL 3865232, at *2 (Bankr. C.D. Cal.

Aug. 6, 2014) (citing *Postal Instant Press* and concluding, "California courts reject outside reverse

piercing"); *see also Goodrich v. Briones (In re Schwarzkopf)*, 626 F.3d 1032, 1038 (9th Cir. 2010)

(applying *Postal Instant Press*).[17]

Like the Ninth Circuit Bankruptcy Appellate Panel in *Mihranian*, this Court finds that

"*Postal Instant Press* is carefully reasoned and persuasive," and this Court "must follow the law of

California's intermediate appellate courts on this point unless [it is] convinced that the California

Supreme Court would decide the issue differently." *In re Mihranian*, 2017 WL 2775043, at *6

(citing *In re Schwarzkopf*, 626 F.3d at 1038). This Court is not convinced that the California

Supreme Court would decide this issue differently. Thus, this Court will decline to apply the

---

[17] More recently, a California Court of Appeal distinguished *Postal Instant Press* and concluded that outside reverse piercing is permissible in the context of a limited liability company because, unlike a corporation, a limited liability company does not issue shares on which a creditor may levy and creditors do not have sufficient alternative remedies at law. *See Curci Investments, LLC v. Baldwin*, 14 Cal. App. 5th 214, 222-23 (2017). *Curci* is not applicable to the present case because, among other reasons, the entities that Plaintiff wishes to disregard are *corporations* not *LLCs*, which means Plaintiff had adequate remedies at law, including fraudulent transfer, conversion, or levying upon Defendant's shares in such corporations. Plaintiff even had the ability to levy upon shares owned by Defendant that were not represented by a stock certificate. *See* Cal. Com. Code §§ 8102(a)(18), 8112(b).

**MEMORANDUM OF DECISION**

1  outside reverse piercing doctrine to impute ownership of the relevant accounts receivable upon

2  Defendant.

3      To support its alter ego theory, Plaintiff relies in part on *Sethi v. Wells Fargo Bank, N.A. (In*

4  *re Sethi)*, BAP No. EC–13–1312–KuJuTa, 2014 WL 2938276, at *1 (B.A.P. 9th Cir. June 30,

5  2014) ("*Sethi I*").  *See Plaintiff's Opening Brief on Closing Argument*, Adv. Dkt. 120 at 36:28-37:3.

6  In *Sethi I*, a creditor brought a section 727 action against a debtor who was a doctor that operated

7  her medical practice through a corporation.  *Id.*  The Ninth Circuit Bankruptcy Appellate Panel

8  ("BAP") vacated a section 727 judgment in relevant part because the bankruptcy court failed to

9  make a finding that certain transferred property was "property of the debtor" for purposes of section

10  727(a)(2), rather than property of debtor's corporation.  *See id.* at *6-7.  The BAP in *Sethi I* noted

11  that "California law recognizes the separateness of corporate assets and liabilities."  *Id.* at *6 (citing

12  *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th at 538).  And, moreover, "so have the

13  better-reasoned federal cases interpreting the scope of § 727(a)(2)."  *Id.* (collecting cases).  After

14  remand and a second appeal, the BAP reversed the bankruptcy court after it disregarded the

15  separateness of the debtor and her corporation and again entered judgment against the debtor.  BAP

16  No. EC–15–1173–TaJuD, 2016 WL 3961258, at *1 (B.A.P. 9th Cir. July 12, 2016) ("*Sethi II*").

17  The BAP in *Sethi II* reiterated the separateness of corporate assets from those of its shareholders,

18  and noted as follows:

19          The bankruptcy court's refusal to acknowledge the separateness of asset
            ownership between the Debtor and her corporations is troublesome.  That
20          the Debtor personally guaranteed the loans to purchase the equipment is
            irrelevant, as is the fact that the Debtor was the sole shareholder of the
21          medical corporation. While that may have meant that the corporate stock
            was estate property, the reach of § 541(a) in an individual bankruptcy case
22          did not automatically extend to corporate assets.

23  *Id.* at *3.  The BAP's reversal of the bankruptcy court on this basis support's this Court's refusal to

24  pierce the corporate veil to impute upon Defendant ownership of his corporations' assets.[18]

25

26

27  _____

    [18] The BAP in *Sethi I* briefly discussed its decision in *Hoffman v. Bethel Native Corp. (In re Hoffman)*, 2007 WL
    7540947 (B.A.P. 9th Cir. 2007) affirming the bankruptcy court's decision to pierce the corporate veil for purposes of
    section 727(a)(2).  2014 WL 2938276, at *7.  However, the *Hoffman* decision came down before *Postal Instant Press*
28  called outside reverse piercing "an unacceptable shortcut."  Moreover, *Hoffman* questionably relied on substantive
    consolidation cases and not alter ego cases.  *See In re Hoffman*, 2007 WL 7540947, at *5.

**MEMORANDUM OF DECISION**

1    Moreover, even if this Court could apply the outside reverse piercing doctrine, Plaintiff

2 failed to meet its burden as the party seeking to establish alter ego liability.  Plaintiff must prove:

3 "(1) that there be such unity of interest and ownership that the separate personalities of the

4 corporation and the individual no longer exist, and (2) that, if the acts are treated as those of the

5 corporation alone, an inequitable result will follow."  *Associated Vendors, Inc. v. Oakland Meat

6 Co*., 210 Cal. App. 2d 825, 837 (1962) (citing *Automotriz Del Golfo de California S.A. de C.V. v.

7 Resnick*, 47 Cal. 2d 792, 796 (1957)).  "Before a corporation's acts and obligations can be legally

8 recognized as those of a particular person, and vice versa, it must be made to appear that the

9 corporation is not only influenced and governed by that person, but that there is such a unity of

10 interest and ownership that the individuality, or separateness, of such person and corporation has

11 ceased, and that the facts are such that an adherence to the fiction of the separate existence of the

12 corporation would, under the particular circumstances, sanction a fraud or promote injustice."  *Id.*

13    "The first requirement for disregarding the corporate entity under the alter ego doctrine—

14 whether there is sufficient unity of interest and ownership that the separate personalities of the

15 individual and the corporation no longer exist—encompasses a series of factors."  *Misik v. D'Arco*,

16 197 Cal. App. 4th 1065, 1073 (2011).  Factors suggesting an absence of separate personalities of

17 the individual and the corporation include:

18

19
     (i)     commingling of funds and other assets and failure to segregate
             funds of the separate entities;

20
     (ii)    the treatment by an individual of the assets of the corporation as
             his own;

21

22
     (iii)   the disregard of legal formalities and the failure to maintain arm's
             length relationships among related entities; and

23

24
     (iv)   the diversion of assets from a corporation by or to a stockholder or
             other person or entity, to the detriment of creditors, or the
             manipulation of assets between entities so as to concentrate the
             assets in one and the liabilities in another.

25

26 *In re Schwarzkopf*, 626 F.3d 1032, 1038 (9th Cir. 2010) (quoting *Associated Vendors, Inc. v.

27 Oakland Meat Co*., 210 Cal. App. 2d at 838-840 (setting forth a list of non-exhaustive factors

28 courts have used)) (internal quotations and alterations omitted).  "No one characteristic governs,

**MEMORANDUM OF DECISION**

1   but the courts must look at all the circumstances to determine whether the doctrine should be

2   applied." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th at 539.

3          "Alter ego is an extreme remedy, sparingly used." *Sonora Diamond Corp. v. Superior

4   Court*, 83 Cal. App. 4th at 539.  There must be a "showing of such critical facts as inadequate

5   capitalization, commingling of assets, disregard of corporate formalities, [or] . . . other facts which

6   demonstrate the critical element: that an inequitable result would have followed if the corporate

7   separateness had been respected." *Tomaselli v. Transamerica Ins. Co.*, 25 Cal. App. 4th 1269,

8   1285 (1994).  "The alter ego doctrine does not guard every unsatisfied creditor of a corporation but

9   instead affords protection where some conduct amounting to bad faith makes it inequitable for the

10  corporate owner to hide behind the corporate form.  *Difficulty in enforcing a judgment or collecting

11  a debt does not satisfy this standard*." *Sonora Diamond Corp. v. Superior Court*, 83 Cal. App. 4th

12  at 539 (emphasis added).

13         While Defendant testified that he has no personal bank accounts and he uses his

14  corporations' bank accounts as his own, Plaintiff failed to present other evidence demonstrating

15  such unity of interest and ownership that the separate personalities of the corporations and

16  Defendant no longer exist.  For example, Plaintiff presented no evidence that Defendant's

17  corporations diverted assets to the detriment of creditors, commingled funds, or disregarded

18  corporate formalities.  Plaintiff's arguments at trial and in its briefing simply cannot take the place

19  of admissible evidence.[19]

20         Accordingly, the Court finds that Plaintiff failed to prove that Defendant personally owned

21  any accounts receivable on the Petition Date or during the one-year period preceding the Petition

22  Date, and Plaintiff's alter ego claim also fails as a matter of law.  Moreover, even if alter ego

23  liability was an appropriate remedy in this case, Plaintiff failed to carry its burden.

24

25

_____

26  [19] Although it was *Plaintiff's* burden to prove facts supporting its alter ego claim, Plaintiff's counsel implied it was
    *Defendant's* burden to show he observed corporate formalities: "[T]he first point is, is that because the—the
    corporations are just him and that's why we establish—that's why I got up there basically, one of the reasons, is there's

27  no corporate records.  There's no proof he capitalized the businesses.  There's no shares issued.  There's no bylaws,
    there's no minutes, there's no nothing."  Trial Tr., March 5 at 138:1-7; *see also* Plaintiff's Post-Trial Brief, Adv. Dkt.
    120 at 34:24-25 ("Shapow produced no proof any of his companies issued stock or performed corporate formalities").

28  This simply misstates the burden of proof.

**MEMORANDUM OF DECISION**

**B.      The "Transfer" of Accounts Receivable Under Section 727(a)(2)(A)**

Plaintiff failed to identify a theory under section 727(a)(2)(A) for which it provided evidence supporting denial of Defendant's discharge.  Section 727(a)(2)(A) provides that the "court shall grant the debtor a discharge unless . . . the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed . . . *property of the debtor*, within one year before the date of the filing of the petition." 11 U.S.C. § 727(a)(2)(A) (emphasis added).  "A party seeking denial of discharge under § 727(a)(2) must prove two things: '(1) a disposition of property, such as transfer or concealment, and (2) a subjective intent on the debtor's part to hinder, delay or defraud a creditor through the act [of] disposing of the property.'" *In re Retz*, 606 F.3d at 1200 (quoting *Hughes v. Lawson (In re Lawson)*, 122 F.3d 1237, 1240 (9th Cir. 1997)).

Plaintiff identifies its second claim for relief as a denial of discharge under section 727(a)(2)(A) "for transfers taken to hinder, delay or defraud creditors."  *See* FAC, Adv. Dkt. 39 at 8-9; PTS at 15, ¶ 5.  Although Plaintiff failed to identify at trial any alleged transfer of property that could support a claim under section 727(a)(2), the FAC alleges as follows:

> . . . Defendant Shapow, with intent to hinder, delay or defraud Plaintiff and the chapter 7 trustee and all creditors, has transferred, removed, destroyed, mutilated, or concealed property of the Defendant within one year prior to the date of the filing of the petition or ha[s] authorized such acts.  Such acts consists of, but are not limited to, transferring accounts receivables [sic] between Shapow and his corporation in order to make a bogus exemption claim and to avoid West Valley's secured liens, and Shapow's personal use of monies obtained from his receivables at any time from December 15, 2014 through November 30, 2015 when the Bankruptcy petition was filed, which on information was all used by Shapow for his personal expenses.

FAC, Adv. Dkt. 39 at 9, ¶ 30.  Plaintiff's trial brief further alleged that "Shapow either made false ownership statements regarding what legal entity owned the assets or he transferred the assets in violation of the secured liens so these assets were dissipated." Adv. Dkt. 97 at 2:6-8.  At no time did Plaintiff identify a disposition of debtor's property, such as transfer or concealment, that could support a claim under section 727(a)(2)(A).  To the extent Plaintiff relies on the allegation that Defendant personally owned certain accounts receivable, the Court rejects this allegation as

**MEMORANDUM OF DECISION**

1   discussed in detail above.  Accordingly, the Court will enter judgment in favor of Defendant on the

2   claim under section 727(a)(2)(A).

3       **C.      Omissions From the Schedules and SOFA Under Section 727(a)(4)(A).**

4       Section 727(a)(4)(A) provides that the "court shall grant the debtor a discharge unless . . .

5   the debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or

6   account." 11 U.S.C. § 727(a)(4)(A).  Section 727(a)(4)(A) requires a showing that "(1) Debtor

7   made such a false statement or omission, (2) regarding a material fact, and (3) did so knowingly

8   and fraudulently." *In re Khalil*, 379 B.R. at 172 (citing *Searles v. Riley (In re Searles)*, 317 B.R.

9   368, 377 (B.A.P. 9th Cir. 2004)).

10      "A false statement or an omission in the debtor's bankruptcy schedules or statement of

11  financial affairs can constitute a false oath." *In re Retz*, 606 F.3d at 1198 (quoting *In re Khalil*, 379

12  B.R. at 172).  However, "a false statement or omission that has no impact on a bankruptcy case is

13  not material and does not provide grounds for denial of a discharge under § 727(a)(4)(A)." *In re*

14  *Khalil*, 379 B.R. at 172.

15      "A fact is material 'if it bears a relationship to the debtor's business transactions or estate, or

16  concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's

17  property.'" *In re Khalil*, 379 B.R. at 173 (quoting *Fogal Legware of Switzerland, Inc. v. Wills (In*

18  *re Wills)*, 243 B.R. 58, 62 (B.A.P. 9th Cir. 1999)).  An omission or misstatement that

19  "detrimentally affects administration of the estate" is material.  *In re Retz*, 606 F.3d at 1198; *In re*

20  *Wills*, 243 B.R. at 63.  "Even if the debtor can show that the assets were of little value or that a full

21  and truthful answer would not have directly increased the estate assets, a discharge may be denied

22  if the omission adversely affects the trustee's or creditors' ability to discover other assets or to fully

23  investigate the debtor's pre-bankruptcy dealing and financial condition." *In re Wills*, 243 B.R. at 63

24  (citing 6 Collier on Bankruptcy ¶ 727.04[1][b] (15th ed. 1998)).  "Similarly, if the omission

25  interferes with the possibility of a preference or fraudulent conveyance action the omission may be

26  considered material." *Id.*

27      Plaintiff must demonstrate that Defendant acted "knowingly and fraudulently."  11 U.S.C.

28  § 727(a)(4).  A debtor "acts knowingly if he or she acts deliberately and consciously." *In re Retz*,

1  606 F.3d at 1198 (quoting *In re Khalil*, 379 B.R. at 173).  A debtor acts fraudulently if he: (1) made

2  omissions or misstatements in his schedules; (2) that he knew were false at the time he made them;

3  and (3) made them with the intention and purpose of deceiving his creditors.  *In re Retz*, 606 F.3d

4  at 1199 (quoting *In re Khalil*, 379 B.R. at 173).  "An example of circumstantial evidence

5  suggesting an intent to defraud may be found where the debtor fails to clear up all inconsistencies

6  and omissions, even having had an opportunity to do so, such as by filing amended schedules." *In*

7  *re DenBeste*, BAP Nos. NC-12-1087, NC-12-1180, 2012 WL 5416513, at *7, (B.A.P. 9th Cir.,

8  Nov. 6, 2012).  The fraud provision of section 727(a)(4)(A) is similar to common law fraud, but

9  "materiality replaces the elements of reliance and proximately caused damage in a fraud cause of

10  action."  *Roberts v. Erhard (In re Roberts)*, 331 B.R. 876, 884 (B.A.P. 9th Cir. 2005).

11      A debtor has a duty to prepare his statement of financial affairs and schedules "carefully,

12  completely, and accurately."  *Cusano v. Klein*, 264 F.3d 936, 945–946 (9th Cir. 2001).  The "duty

13  to assure accurate schedules of assets is fundamental because the viability of the system of

14  voluntary bankruptcy depends upon full, candid, and complete disclosure by debtors of their

15  financial affairs." *In re Searles*, 317 B.R. at 378.  "Adopting a cavalier attitude toward the

16  accuracy of the schedules and expecting the court and creditors to ferret out the truth is not

17  acceptable conduct by debtors or their counsel." *AT&T Universal Card Servs. Corp. v. Duplante*

18  *(In re Duplante)*, 215 B.R. 444, 447 (B.A.P. 9th Cir. 1997).

19      Plaintiff contends that Defendant made false oaths in violation of Bankruptcy Code section

20  727(a)(4)(A) by failing to disclose in his bankruptcy filings (1) ownership of certain accounts

21  receivable; (2) additional income in 2014 and 2015; (3) ownership of the FJ Cruiser and the

22  Wilshire Condominium; and (4) ownership interests in certain corporate entities.

23          **1.    Accounts Receivable**

24      As discussed in detail above, the Court finds that Plaintiff failed to prove that Defendant

25  personally owned any accounts receivable on the Petition Date or during the one-year period

26  preceding the Petition Date, and Plaintiff's alter ego claim fails as a matter of law.  Plaintiff failed

27  to carry its burden and the Court cannot conclude that Defendant's failure to list ownership of

28

1  accounts receivable on his bankruptcy schedules constituted a false oath within the meaning of

2  Bankruptcy Code section 727(a)(4)(A).

3           **2.      Income in 2014 and 2015**

4           Similarly, the Court cannot impute ownership of the BHHW Bank Account or the Joint

5  Effort Bank Account on Defendant individually.  These bank accounts were undisputedly owned

6  by the respective corporations.  *See* Plaintiffs Exs. 84, 106, 107, 108.  However, Defendant

7  admittedly had no personal bank account and used his corporations' bank accounts for his own

8  personal expenses.  On his SOFA, he estimated gross income of $110,000 in 2014 and $49,000 in

9  2015.  Plaintiff's Exs. 61, 62 at 27; Defendant's Ex. N at 6.  Accordingly, for Plaintiff to prove that

10  Defendant understated his income in 2014 and 2015, Plaintiff could have shown that Defendant

11  spent materially more than $110,000 in 2014 and $49,000 in 2015 on personal expenses from his

12  corporate bank accounts.  But Plaintiff failed to do so.

13          The bank statements offered into evidence by Plaintiff for the BHHW Bank Account and

14  the Joint Effort Bank Account show that (i) in 2014, the total amount of deposits in both accounts

15  was $292,951.24 and the total in withdrawals and fees was $293,215.46; and (ii) the only statement

16  from 2015 was the May 2015 statement for the BHHW Bank Account, which shows $30,057.55 in

17  deposits and $31,457.58 in withdrawals and fees in May 2015.  Other than the May 2015 bank

18  statement for the BHHW Bank Account, Plaintiff offered no other evidence of bank activity in

19  2015.  Even if the entirety of the withdrawals and fees from May 2015 could be classified as

20  Defendant's personal expenses, this amount is much less than his estimated income of $49,000, so

21  Plaintiff failed to prove that Defendant understated his 2015 income.

22          As for the 2014 income, the bank statements show numerous ATM withdrawals and checks

23  payable to "cash" or to Defendant.  The statements also show expenditures at restaurants, grocery

24  stores, and utilities, among other things.  There is no evidence in the record differentiating between

25  personal expenses and business expenses from these bank accounts.  Plaintiff did not elicit

26  testimony from Defendant about the purpose of these expenses or otherwise provide evidence

27  demonstrating that Defendant spent more than $110,000 in 2014 on personal expenses from these

28

**MEMORANDUM OF DECISION**

1   bank accounts.  Accordingly, the Court cannot conclude that Defendant's statement of his 2014 and

2   2015 income constituted a false oath within the meaning of Bankruptcy Code section 727(a)(4)(A).

### 3.    The FJ Cruiser and the Wilshire Condominium

4          Plaintiff contends that Defendant owns both the FJ Cruiser and the Wilshire Condominium,

5   notwithstanding the uncontroverted evidence that he is not the record title holder of either.  In

6   California, there is a record title presumption codified in California Evidence Code section 662,

7   which provides generally that "[t]he owner of the legal title to property is presumed to be the owner

8   of the full beneficial title.  This presumption may be rebutted only by clear and convincing proof."

9   Cal. Evid. Code § 662.  "The record title presumption promotes California's public policy in favor

10  of the stability of titles to property."  *Brace v. Speier, (In re Brace)*, 566 B.R. 13, 19 (B.A.P. 9th

11  Cir. 2017) (citing *In re Marriage of Haines*, 33 Cal. App. 4th 277, 294 (1995)).  "Thus, 'in the

12  absence of any showing to the contrary, the status declared by the instrument through which [the

13  parties] acquired title is controlling.'"  *In re Marriage of Brooks & Robinson*, 169 Cal. App. 4th

14  176, 185 (2008), *abrogated on other grounds, In re Marriage of Valli*, 58 Cal. 4th 1396 (2014)

15  (quoting *Knego v. Grover*, 208 Cal. App. 2d 134, 141 (1962)).  "The presumption can be overcome

16  only by evidence of an agreement or understanding between the parties that the title reflected in the

17  deed is not what the parties intended."  *Id.* at 189-190 (citing *In re Marriage of Lucas*, 27 Cal. 3d

18  808, 813 (1980)).  "This standard requires evidence that is so clear as to leave no substantial doubt

19  and sufficiently strong to command the unhesitating assent of every reasonable mind."  *Id.* at 190

20  (quoting *In re Marriage of Weaver*, 224 Cal. App. 3d 478, 487 (1990)) (internal quotations

21  omitted).

22         Regarding the FJ Cruiser, the parties stipulated at trial that Defendant's father, Nathan

23  Shapow, is the sole record title holder of the FJ Cruiser.  Trial Tr., March 5 at 23:19-23.  Plaintiff

24  offered into evidence an online vehicle record consistent with this stipulation.  *See* Plaintiff's Ex.

25  83.  Plaintiff offered no evidence to refute Defendant's testimony that his father is disabled and

26  made the down payment on the car so Defendant could drive him around.  The fact that Defendant

27  makes the payments on the car loan does not rise to the level of clear and convincing proof

28  necessary to rebut California's record title presumption.  Accordingly, because Plaintiff failed to

**MEMORANDUM OF DECISION**

1   prove that Defendant owns the FJ Cruiser, the Court cannot conclude that Defendant's failure to list

2   ownership of the FJ Cruiser on his bankruptcy schedules constituted a false oath within the

3   meaning of Bankruptcy Code section 727(a)(4)(A).

4        Similarly, it is undisputed that the sole record title holder of the Wilshire Condominium,

5   like the Abington Property before it, is Java, LLC. *See* Trial Tr., March 2 at 151:14-17; Trial Tr.,

6   March 5 at 17:5-8; Trial Tr., March 9 at 108:2-4; Defendant's Ex. Q.  However, Plaintiff contends

7   that Java is owned by Defendant, notwithstanding the testimony and evidence that Java is owned

8   by Defendant's father, and it was previously owned by Defendant's father and late mother.

9   Defendant's testimony about the Abington Property, the Wilshire Condominium, and ownership of

10  Java was corroborated by Defendant's stepson, Roy Silver, whom the Court found to be a credible

11  witness.  Silver testified that he signed the paperwork for the 1031 exchange of the Abington

12  Property for the Wilshire Condominium, that all the proceeds from the sale of the Abington

13  Property went to the purchase of the Wilshire Condominium, and that Defendant received none of

14  the proceeds for himself.  Trial Tr., March 9 at 106:2-111:3; *see* Defendant's Exs. A, Q.

15       The mechanic's lien on the Abington Property, Plaintiff's Ex. 15, does not establish that

16  Defendant owned the Abington Property because such a conclusion would rely on inadmissible

17  hearsay.  It simply establishes that Tri-Tech Restoration Company, Inc. believed that Defendant

18  owned the Abington Property.  Defendant testified that he never would have told someone that he

19  owned the Abington Property because he did not own it, and Plaintiff simply failed to refute this

20  testimony.  Moreover, ownership of the Abington Property would be of little probative value

21  because the issue here is whether Defendant made a false oath regarding ownership of the Wilshire

22  Condominium.

23       As for the testimony of Gary Grabel that Defendant discussed with him sometime in 2009

24  the manner in which one should hold title to property, the Court does not accord much weight to

25  such testimony.  Mr. Grabel, as Plaintiff's principal and longtime adversary of Defendant, has a

26  material interest in the outcome of this proceeding and on the issue of Defendant's ownership of the

27  Wilshire Condominium.  Moreover, Mr. Grabel's testimony regarding the alleged conversation with

28  Defendant differed on direct examination and cross-examination.  On direct examination, Mr.

**MEMORANDUM OF DECISION**

1  Grabel testified that Defendant told him he should hold title to his house in a limited liability

2  company or corporation so he could avoid creditors.  Trial Tr., March 2 at 17:21-18:1.  However,

3  on cross-examination, Mr. Grabel testified that Defendant said that he held title to his own house in

4  the name of an entity to avoid his creditors.  Trial Tr., March 2 at 20:17-24.  Such conflicting

5  testimony by an interested witness is of little probative value in establishing clear and convincing

6  proof to overcome the record title presumption.

7      Thus, because Plaintiff failed to prove that Defendant is the beneficial owner of the

8  Wilshire Property or the actual owner of Java, LLC, the Court cannot conclude that Defendant's

9  failure to list ownership of the Wilshire Property on his bankruptcy schedules constituted a false

10  oath within the meaning of Bankruptcy Code section 727(a)(4)(A).

11              **4.    Corporate Interests**

12      Despite the numerous business entities with which Defendant has been involved, he listed

13  an ownership interest in only two entities in response to item 13 on his Schedule B regarding

14  "[s]tock and interests in incorporated and unincorporated businesses."  He initially listed only a

15  100% ownership interest in Beverly Hills Health Works, and then he later amended his Schedule B

16  to add a 30% interest in Gratto Aquatic.  *See* Plaintiff's Exs. 60 at 2, 61 at 8; Defendant's Ex. N at 3.

17  However, Defendant's original SOFA disclosed interests in Total Wellness Rehabilitation, Beverly

18  Hills Health Works, and Joint Effort Medical, *see* Plaintiff's Exs. 61, 62 at 32, and his amended

19  SOFA added an interest in Gratto Aquatic, *see* Defendant's Ex. N at 11.  As described below, the

20  Court cannot conclude that any omission justifies denial of Defendant's discharge under section

21  727(a)(4)(A) because Plaintiff failed to prove either that the omission was a false oath, that it was

22  material, or that Defendant did not simply omit a fictitious business name.

23              **a.    Gratto Aquatic**

24      It is undisputed that, as of the Petition Date, Defendant had a 30% ownership interest in

25  Gratto Aquatic, which was formed in June 2015, approximately five months before the Petition

26  Date.  While Defendant did not initially list an ownership interest in Gratto Aquatic in his

27  schedules, he amended his Schedule B and SOFA on November 21, 2017, to represent his 30%

28  ownership interest as of the Petition Date.

**MEMORANDUM OF DECISION**

1    The Court is not persuaded that Defendant acted "knowingly and fraudulently" when he

2  omitted Gratto Aquatic from his Schedule B and SOFA.  Defendant testified the Gratto Aquatic

3  was formed to facilitate a contract for Defendant to provide aquatic therapy at the Los Angeles spa

4  Grotto del Sal using its salt water pools and facilities.  He also testified that Gratto Aquatic had no

5  assets on the Petition Date because it was not yet operating, which is why he did not initially list it

6  on his bankruptcy schedules.  Given that there would be no incentive for Defendant to omit Gratto

7  Aquatic from his original schedules because it had no assets or value, and he later amended his

8  Schedule B and SOFA to add Gratto Aquatic, the Court cannot conclude that Defendant acted

9  knowingly and fraudulently by initially omitting Gratto Aquatic from his schedules.

10    However, even if Defendant had acted knowingly and fraudulently, Plaintiff failed to prove

11  that Defendant's omission of Gratto Aquatic was material.  There is no evidence that Gratto

12  Aquatic owned any assets or otherwise had value on the Petition Date.  The only additional

13  information the Trustee would have obtained if Defendant initially listed Gratto Aquatic in his

14  schedules was that Defendant had a 30% ownership interest in a valueless entity under which he

15  may or may not perform services in the future.  Such an omission does not detrimentally affect

16  administration of the estate.  Accordingly, the Court cannot conclude that Defendant's omission of

17  Gratto Aquatic from his schedules and SOFA justifies denial of his discharge under section

18  727(a)(4)(A).

19    **b.    Other Entities**

20    **i.    BKP Wellness**

21    Defendant testified that he was a part owner of BKP Wellness.  Trial Tr., March 2 at 114:2-

22  6.  However, BKP Wellness ceased doing business under its own name in 2007 and instead

23  operated under the fictitious business name "Total Wellness Rehabilitation," at the request of

24  Defendant's former business partner, Brian Padveen.  Trial Tr., March 2 at 117:7-118:9, 128:3-6;

25  Plaintiff's Ex. 26.  Thus, the Court cannot conclude that Defendant's omission of BKP Wellness

26  from Schedule B was a false oath because the business operated under the name "Total Wellness

27  Rehabilitation" since 2007, *see id.*; Defendant disclosed his interest in Total Wellness

28  Rehabilitation in the Total Wellness Rehabilitation Case, *see* Case No. 1:15-bk-13752-VK, Dkt. 9

-34-

**MEMORANDUM OF DECISION**

1  at 25, ¶ 21; and Defendant disclosed his interest in Total Wellness Rehabilitation on his SOFA in

2  this case, *see* Plaintiff's Exs. 61, 62 at 32.

3           **ii.         Mike Shapow, Registered Physical Therapist, Inc.**

4           Defendant listed no ownership interest in "Mike Shapow, Registered Physical Therapist,

5  Inc." on his Schedule B in this case, but on the Schedule B filed in Defendant's First Bankruptcy

6  Case on December 26, 2012, Defendant *did* list a 100% ownership interest in this entity. *See*

7  Plaintiff's Ex. 44 at 2; Case No. 2:12-bk-50729-NB, Dkt. 9.  However, the Court cannot conclude

8  that this omission was a false oath because there is nothing in the record indicating that Defendant

9  still had an ownership interest in this entity on the Petition Date *in this case*.  Moreover, Defendant

10 testified that "Mike Shapow, Registered Physical Therapist, Inc." never operated, never billed for

11 Defendant, held no accounts receivable, and had no assets.  Trial Tr., March 5 at 66:9-67:2.

12 Plaintiff failed to refute these facts.

13          **iii.        Total Wellness Rehabilitation**

14          Defendant did not list an ownership interest in Total Wellness Rehabilitation on his

15 Schedule B in this case, but he identified himself as the President and 100% owner on the SOFA in

16 the Total Wellness Rehabilitation Case. *See* Case No. 1:15-bk-13752-VK, Dkt. 9 at 25, ¶ 21.  The

17 Court concludes that this omission was not material under the circumstances.  First, Plaintiff did

18 not raise this omission, implicitly acknowledging it could not support a section 727 claim.  Second,

19 while Defendant did not list Total Wellness Rehabilitation on his Schedule B, he did list it on his

20 SOFA.  Third, the schedules in the Total Wellness Rehabilitation Case indicate that the entity's

21 liabilities ($1,068,491) far exceeded its assets ($69,682), so Total Wellness Rehabilitation was

22 valueless. *See* Case No. 1:15-bk-13752-VK, Dkt. 9.  This is supported by the "no-asset" report

23 entered by the chapter 7 trustee in that case. *See id.* Case Dkt.  Finally, the Trustee in this case was

24 also the chapter 7 trustee in the Total Wellness Rehabilitation Case, so he knew of Defendant's

25 ownership interest and of Total Wellness Rehabilitation's lack of value.  Thus, the omission was

26 not material because it did not detrimentally affect administration of this estate.

27

28

**MEMORANDUM OF DECISION**

1            iv.      **Joint Effort Medical Wellness**

2            Defendant did not list an ownership interest in Joint Effort Medical Wellness on his

3    Schedule B in this case, but he testified that he presently owns the entity.  Trial Tr., March 2 at

4    88:25-89:2.  Defendant also listed a 100% ownership interest in Joint Effort Medical Wellness on

5    the Schedule B filed in Defendant's First Bankruptcy Case on December 26, 2012.  *See* Plaintiff's

6    Ex. 44 at 2; Case No. 2:12-bk-50729-NB, Dkt. 9.  However, Defendant also testified that "Joint

7    Effort" was simply a fictitious name that he continued to use after the business wound down so that

8    he could continue to collect on bills and receive mail.  Trial Tr., March 9 at 81:19-82:4.  This

9    testimony is supported by bank statements from the BHHW Bank Account on which Plaintiff

10   heavily relied, which identify the account holder as "Beverly Hills Health Works II dba Joint Effort

11   Medical Wellness."  *See* Plaintiff's Exs. 84, 108.  As for the screenshot of the website for Joint

12   Effort Medical Wellness offered into evidence by Plaintiff, Plaintiff's Ex. 96, Defendant testified

13   that notwithstanding the date shown on the screenshot, January 4, 2017, Joint Effort Medical

14   Wellness had stopped doing business in 2013, and the website's continued availability would have

15   been a mistake because he did not maintain the website himself.  Trial Tr., March 9 at 72:15-73:1,

16   74:4-9, 75:23-76:20, 79:7-18, 92:6-94:15.  At first Defendant testified that the paperwork he

17   presented to his clients still read "Joint Effort Medical Wellness" as late as 2015 or 2016.  Trial Tr.,

18   March 9 at 96:3-11, 97:21-24.  He later changed his story and said that the paperwork would have

19   included only the name of Beverly Hills Health Works at that time.  Trial Tr., March 9 at 98:3-14.

20   The Court finds that the testimony regarding the website and Defendant's continued use of the Joint

21   Effort Medical Wellness paperwork is consistent with the notion that Joint Effort Medical Wellness

22   was no longer operating and was simply a fictitious business name he kept to enable him to collect

23   receivables and accept mail.

24           The Court cannot conclude that Defendant made a false oath in violation of section

25   727(a)(4)(A) by omitting Joint Effort Medical Wellness from his Schedule B because Plaintiff

26   failed to offer evidence demonstrating the nature of Joint Effort Medical Wellness in relation to

27   Defendant's business.  However, even if such an omission was a false oath, Plaintiff failed to prove

28   that the omission was material for several reasons.  First, Joint Effort Medical Wellness appears to

**MEMORANDUM OF DECISION**

1  have been a fictitious name for Beverly Hills Health Works, which Defendant *did* disclose on his

2  Schedule B, and Joint Effort Medical Wellness was listed on Defendant's SOFA.  Moreover,

3  Defendant testified that many of Joint Effort Medical Wellness' receivables were uncollectable, and

4  others appear to have been turned over to Epic as a result of its judgment.  Finally, Plaintiff failed

5  to demonstrate that Joint Effort owned assets or otherwise had value on the Petition Date, that the

6  Trustee would have obtained additional information if Defendant had listed Joint Effort Medical

7  Wellness on his schedule B, or that such an omission detrimentally affected administration of the

8  estate.

9  **c.     Series II Entities**

10  Defendant listed on his SOFA Beverly Hills Health Works, Joint Effort Medical Wellness,

11  and Total Wellness Rehabilitation, but he did not list Beverly Hills Health Works II, Joint Effort

12  Medical Wellness II, or Total Wellness Rehabilitation II.  Plaintiff contends that Defendant's

13  failure to list the Series II Entities was a material omission that supports denial of discharge under

14  section 727(a)(4).  The Court concludes that the omission of the Series II Entities were false oaths

15  under section 727(a)(4), but Plaintiff failed to prove that these omissions were material.

16  As of the trial date, the California Secretary of State's records showed the following

17  business entity profiles:[20]

| Entity Number | Registration Date | Status | Entity Name | Agent for Service of Process |
|---|---|---|---|---|
| C2200188 | 10/13/2000 | SOS/FTB SUSPENDED[21] | Beverly Hills Health Works | Mike Shapow |

[20] Pursuant to Federal Rule of Evidence 201, the Court "may take judicial notice on its own" of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2), (c)(1).  "Under Rule 201, the court can take judicial notice of '[p]ublic records and government documents available from reliable sources on the Internet,' such as websites run by governmental agencies." *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d 1011, 1033-34 (C.D. Cal. 2015) (citing *Hansen Beverage Co. v. Innovation Ventures, LLC,* No. 08-CV-1166-IEG, 2009 WL 6597891, *1 (S.D. Cal. Dec. 23, 2009)); *see also Daniels-Hall v. National Education Association,* 629 F.3d 992, 999 (9th Cir.2010) (taking judicial notice of information on the websites of two school districts because they were government entities); *Paralyzed Veterans of Am. v. McPherson,* No. C 06–4670, 2008 WL 4183981, *5 (N.D. Cal. Sept. 8, 2008) ("Information on government agency websites has often been treated as properly subject to judicial notice").  "The court will therefore take judicial notice of the business entity profiles on the California Secretary of State's website." *Gerritsen v. Warner Bros. Entm't Inc.*, 112 F. Supp. 3d at 1034.

[21] "Suspended" generally means the "entity's powers, rights and privileges, which include the right to use the entity's name in California, were suspended or forfeited in California."  *See Business Search – Frequently Asked Questions*, CALIFORNIA SECRETARY OF STATE, https://www.sos.ca.gov/business-programs/business-entities/cbs-field-status-
*(Continued...)*

**MEMORANDUM OF DECISION**

| Entity Number | Registration Date | Status | Entity Name | Agent for Service of Process |
|---|---|---|---|---|
| C3533555 | 02/11/2013 | FTB SUSPENDED | Beverly Hills Health Works II | Sepi Dayan |
| C2617683 | 07/12/2004 | FTB SUSPENDED | Joint Effort Medical Wellness | Mike Shapow |
| C3546801 | 03/25/2013 | FTB SUSPENDED | Joint Effort Medical Wellness II | Morris Shapow |
| C2617599 | 07/12/2004 | FTB SUSPENDED | Total Wellness Rehabilitation | Mike Shapow |
| C3533554 | 02/11/2013 | FTB SUSPENDED | Total Wellness Rehabilitation II | Sepi Dayan |

*See Business Search*, CALIFORNIA SECRETARY OF STATE, https://businesssearch.sos.ca.gov.

In each case the record shows that the Series I Entity was registered with the California Secretary of State in the early 2000s, and the Series II Entity was registered in early 2013 while the Series I Entity was suspended for failure to pay state taxes. *See Business Search*, CALIFORNIA SECRETARY OF STATE, https://businesssearch.sos.ca.gov; Trial Tr., March 2 at 64:11-17, 168:21-24, 169:15-18. The Series II Entities each have different entity numbers from their respective Series I Entity. *See id.*; PTS at 3, ¶ 7. Defendant testified that he executed the Certificates of Amendment of Articles of Incorporation to add "II" to the respective Series I Entity's name in early March 2013, and the Certificates were filed with the California Secretary of State on May 31, 2013. Trial Tr., March 2 at 64:5-23, 120:9-21, 126:24-127:21; Plaintiff's Exs. 20, 36, 40. This seems to support Defendant's testimony that each Series II Entity was the same entity as its respective Series I Entity. Plaintiff failed to produce evidence, such as a tax return, showing that the Series II Entities were different entities from their respective Series I Entities. In fact, the statements for the Joint Effort Bank Account show that the same bank account continued to be used for Joint Effort Medical Wellness even after the name was changed to Joint Effort Medical Wellness II. Plaintiff's Exs. 106, 107; Trial Tr., March 2 at 167:11-168:10.

---

definitions. "SOS Suspended" means the entity "was suspended . . . by the Secretary of State for failure to file the required Statement of Information." *Id.* "FTB Suspended means the entity "was suspended . . . by the Franchise Tax Board for failure to meet tax requirements (e.g., failure to file a return, pay taxes, penalties, interest)." *Id.* "SOS/FTB Suspended" means the entity "was suspended . . . by both the Secretary of State and the Franchise Tax Board as stated above." *Id.*

**MEMORANDUM OF DECISION**

However, even if Defendant was correct in his belief that each Series II Entity was the same entity as its respective Series I Entity, this does not explain his failure to schedule the entities using their true names.  Defendant's testimony shows that he changed the names of the Series I Entities so he could continue to operate while avoiding a levy by the California Franchise Tax Board.  When he was asked why he changed the name of Total Wellness Rehabilitation to Total Wellness Rehabilitation II, Defendant testified, "I had a Franchise Tax Board lien that I couldn't operate, and I just had to form another corporation.  I couldn't make a living." Trial Tr., March 2 at 64:11-17. He said the same was true of Joint Effort Medical Wellness.  Trial Tr., March 2 at 168:21-24. When he was asked, "[O]ther than delaying, making it harder for someone to levy on the bank account, what reason would you have for changing the name?," the Defendant responded, "No other reason."  Trial Tr., March 2 at 169:15-18Trial Tr., March 2 at 64:11-17, 168:21-24, 169:15-18.  This testimony proves that Defendant's only reason for changing the names was to deceive at least one creditor, the Franchise Tax Board, and he did this deliberately and consciously. Moreover, his failure to schedule the Series II Entities was "fraudulent" for purposes of section 727(a)(4)(A) because he knew the Series I Entities' names had been changed when he listed them on his SOFA, and the Court can easily infer that his intention when he made the omission was the same as it was when he decided to change the names—to deceive his creditors.  Thus, Defendant acted "knowingly and fraudulently" when he failed to list the true names of the Series II Entities on his SOFA.

However, on the record before it, the Court cannot conclude that these omissions were material.  As discussed above, Plaintiff failed to demonstrate that the Series II Entities were different entities from their respective Series I Entities, which Defendant *did* list on his SOFA. Plaintiff identified no asset, transfer, cause of action, or anything else the Trustee would have been able to discover had Defendant scheduled the Series II Entities.  Plaintiff has not articulated how the Trustee's understanding of Defendant's financial condition would have been different without these omissions.  Thus, these omissions were not material because they did not detrimentally affect administration of the estate, and they cannot support denial of Defendant's discharge under section 727(a)(4)(A).

**MEMORANDUM OF DECISION**

1            **d.      Westshore Medical Billing**

2            At trial, Plaintiff presented for the first time a theory that Defendant made a false oath by

3    not listing Westshore in response to item 19 on his SOFA. *See* Trial Tr., March 2 at 76:18-21,

4    March 5 at 146:25-147:2.  Item 19 asks for a list of all (a) "bookkeepers and accountants" who

5    "kept or supervised the keeping of books of account and records of the debtor" within two years

6    preceding the Petition Date; (b) "firms or individuals" who "audited the books . . . or prepared a

7    financial statement of the debtor" within two years preceding the Petition Date; (c) "firms or

8    individuals" who "were in possession of the books of account and records of the debtor" on the

9    Petition Date; and (d) "financial institutions, creditors and other parties" to whom a financial

10   statement was issued by the debtor within two years preceding the Petition Date.  *See* Plaintiff's

11   Exs. 61, 62 at 33.  First, the Court rejects that notion that Westshore, as a billing collector, is a

12   "bookkeeper or accountant" For the debtor.  Even though Westshore performed its billing and

13   collection work within two years of the Petition Date, it performed the work for Defendant's

14   business entities, not for Defendant, so any books or records it possessed did not belong to

15   Defendant.  Finally, even if Plaintiff could establish that Westshore possessed *Defendant's* books

16   and records, and the omission of Westshore from item 19 was a false oath, such an omission was

17   not material because Westshore possessed only information regarding the accounts receivable that

18   the Court finds were not property of the Defendant.  Thus, omission of Westshore from item 19 on

19   the SOFA did not detrimentally affect administration of the estate.

20                                            * * *

21           Thus, the Court will enter judgment in Defendant's favor on the claims under section

22   727(a)(4)(A) because Plaintiff failed to prove that Defendant, knowingly and fraudulently, made a

23   false statement or omission regarding a material fact.

24       **D.      Section 727(a)(3)**

25           Although it appears that Plaintiff has all but abandoned its cause of action under

26   Bankruptcy Code section 727(a)(3), the Court will address the theory on the merits.  The Pre-Trial

27   Stipulation references section 727(a)(3) as a disputed issue of law to be litigated at trial.  Plaintiff,

28   however, failed to present any evidence in support of this cause of action.  Plaintiff also failed to

**MEMORANDUM OF DECISION**

1   direct the Court to any such evidence in its post-trial briefs.  Adv. Dkt. 120, 124.  In fact, in the 54

2   pages of Plaintiff's post-trial briefing, the only mention of section 727(a)(3) comes in the

3   conclusion of the final brief as follows: "Plaintiff carried its burden of proof to prove facts

4   supporting denial of discharge under 727(a)(4), 727(a)(2) and 727(a)(3)."  Adv. Dkt. 124 at 9.

5         Section 727(a)(3) provides for denial of a debtor's discharge if "the debtor has concealed,

6   destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including

7   books, documents, records, and papers, from which the debtor's financial condition or business

8   transactions might be ascertained, unless such act or failure to act was justified under all of the

9   circumstances of the case."  11 U.S.C. § 727(a)(3).  To establish a prima facie case, the plaintiff

10  must show "(1) that the debtor failed to maintain and preserve adequate records, and (2) that such

11  failure makes it impossible to ascertain the debtor's financial condition and material business

12  transactions."  *Caneva v. Sun Communities Operating Ltd. P'ship (In re Caneva)*, 550 F.3d 755,

13  762 (9th Cir. 2008) (quoting *Lansdowne v. Cox (In re Cox)*, 41 F.3d 1294, 1296 (9th Cir. 1994)).

14  Section 727(a)(3) places an affirmative duty on the debtor to keep and preserve records accurately

15  documenting his or her business and personal affairs.  *Id.* at 761.

16        Plaintiff has not identified any failure by Defendant to maintain or preserve adequate

17  records.  To the extent Plaintiff intended to base a section 727(a)(3) claim on the theory that

18  Defendant failed to provide documents in response to Plaintiff's discovery requests in the

19  underlying state court action and related judgment debtor examinations, the theory fails because

20  those events were too remote in time, and there is no evidence that Defendant failed to maintain

21  and preserve records *in connection with this case*.  Plaintiff obtained its judgment in the state court

22  action in September 2010, more than five years before the Petition Date, and Plaintiff's counsel

23  testified that he sought documents in connection with the judgment debtor examination conducted

24  in December 2014, almost one year before the Petition Date.  *See, e.g.,* Trial Tr., March 5 at 87:16-

25  21.  There is no evidence that Defendant failed to respond to discovery in this case or that the

26  Trustee could not ascertain Defendant's financial condition based on Defendant's failure to maintain

27  or preserve his books and records.  To the extent Plaintiff intended to base this claim on

28  Defendant's failure provide documentation of the billing done by entities collecting accounts

**MEMORANDUM OF DECISION**

1  receivable in connection with his services, the theory fails because those accounts receivable were

2  not property of the Defendant.  Accordingly, the Court will enter judgment in favor of Defendant

3  on the claim under section 727(a)(3).

4

**V.    CONCLUSION**

5       Plaintiff stated plausible theories under section 727 in the FAC, in its briefing, and at trial,

6  but it simply failed to provide enough evidence to support those theories, especially in light of the

7  policy construing section 727 liberally in favor of debtors and strictly against parties objecting to

8  discharge.  *See In re Retz*, 606 F.3d at 1196.  Thus, for all the foregoing reasons, the Court finds

9  that Plaintiff failed to meet its burden establishing that Defendant's discharge should be withheld

10  pursuant to Bankruptcy Code sections 727(a)(2)(A), 727(a)(3), or 727(a)(4)(A).  Accordingly, the

11  Court will enter a separate judgment in favor of Defendant on the entire FAC.

12                       # # #

13

14

15

16

17

18

19

20

21

22

23  Date: March 8, 2019

_____
Martin R Barash
United States Bankruptcy Judge

24

25

26

27

28

-42-

**MEMORANDUM OF DECISION**
